1    WILLIAM L. STERN (CA SBN 96105)
     WStern@mofo.com
2    WILLIAM F. TARANTINO (CA SBN 215343)
     WTarantino@mofo.com
3    LISA A. WONGCHENKO (CA SBN 281782)
     LWongchenko@mofo.com
4    LAUREN WROBLEWSKI (CA SBN 291019)
     LWroblewski@mofo.com
5    MORRISON & FOERSTER LLP
     425 Market Street
6    San Francisco, CA  94105-2482
     Telephone: 415.268.7000
7    Facsimile: 415.268.7522

8    JULIE Y. PARK (CA SBN 259929)
     JuliePark@mofo.com
9    MORRISON & FOERSTER LLP
     12531 High Bluff Drive
10   San Diego, CA  92130-2040
     Telephone: 858.720.5100
11   Facsimile: 858.720.5125

12   Attorneys for Defendants
     LUMBER LIQUIDATORS, INC.,
13   LUMBER LIQUIDATORS LEASING, LLC,
     LUMBER LIQUIDATORS HOLDINGS, INC.,
14   and LUMBER LIQUIDATORS SERVICES, LLC

15

16                    UNITED STATES DISTRICT COURT

17                   NORTHERN DISTRICT OF CALIFORNIA

18                      SAN FRANCISCO DIVISION

19

20   JAMES SILVERTHORN, individually and on      Case No. 4:15-cv-01428 JST
     behalf of all others similarly situation,
21                                               **DEFENDANTS' MEMORANDUM OF**
                      Plaintiffs,                **POINTS AND AUTHORITIES IN**
22                                               **OPPOSITION TO PLAINTIFF'S**
              v.                                 **MOTION FOR PROTECTIVE ORDER**
23                                               **AND FOR EXPEDITED DISCOVERY**
     LUMBER LIQUIDATORS, INC.; LUMBER
24   LIQUIDATORS LEASING, LLC; LUMBER            Hearing Date:   May 14, 2015
     LIQUIDATORS HOLDINGS, INC.; and             Time:           2:00 p.m.
25   LUMBER LIQUIDATORS SERVICES,                Dept:           1, 17th Floor
     LLC.,                                       Judge:          Hon. Jon Tigar
26
                      Defendants.                Complaint filed:  March 27, 2015
27

28

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................... iii

MEMORANDUM OF POINTS AND AUTHORITIES .......................................................... 1

I.   INTRODUCTION AND SUMMARY OF ARGUMENT ............................................. 1

II.  FACTUAL BACKGROUND ........................................................................................ 2

   A.   The *60 Minutes* Program. ................................................................................ 2

   B.   These Cases Started With a "Prop 65" Case Brought by a Short
        Seller. .............................................................................................................. 2

   C.   A Cascade of Litigation and the "MDL" Proceeding. ...................................... 3

   D.   The *Silverthorn* Motion and the Competing *Washington* Motion. ................... 3

   E.   The Named Plaintiff. ........................................................................................ 3

   F.   Background of This Product and the Regulatory Regime. ................................ 4

        1.   What is Laminate Flooring? ................................................................... 4

        2.   What is CARB Compliance? ................................................................... 5

   G.   The CPSC's Involvement and Its Rejection of Deconstructive
        Testing. ............................................................................................................. 5

   H.   Lumber Liquidators' Indoor Air Quality Testing Program. .............................. 6

        1.   The Indoor Air Test Kit ......................................................................... 6

        2.   There Are No Strings Attached. .............................................................. 6

        3.   How the Indoor Air Testing Program Works .......................................... 7

        4.   CPSC Staff Has Reviewed the Program and
             Communications. ..................................................................................... 9

III. ARGUMENT ............................................................................................................... 10

   A.   Plaintiff's Arbitration Allegation Is a Non-Issue. ............................................. 10

   B.   Plaintiff Has Adduced No Facts Warranting Court Supervision
        Over Defendants' Communications With Concerned Customers. ..................... 12

        1.   Plaintiff Has No Evidence That Anyone's Rights Are Being
             Waived. ................................................................................................... 12

        2.   The CPSC's Oversight Eliminates Concerns About Public
             Health. ..................................................................................................... 14

        3.   Plaintiff Has No Evidence of Improper Communications. ...................... 14

             a.   Plaintiff Cannot Require Defendants to Carry His Messages. ...... 14

             b.   There Is No Evidence That Defendants' Communications
                  Seek to Interfere With the Putative Class Action ......................... 16

             c.   There Is No Evidence That Any Putative Class Member Is
                  Being Asked to Change His/Her Legal Position. .......................... 17

             d.   There Is No Evidence That Defendants' Communications
                  Are Misleading. ............................................................................ 18

e.      There Is No Evidence of Coercion.................................................23

C.      Plaintiff Has Not Shown Facts Warranting Expedited Discovery........................24

IV.     CONCLUSION .................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Atari v. Super. Ct.*,
   166 Cal. App. 3d 867 (1985)...................................................................... 16

*Austen v. Catterton Partners V, LP*,
   831 F. Supp. 2d 559 (D. Conn. 2011) ......................................................... 22

*Belt v. Emcare, Inc.*,
   299 F. Supp. 2d 664 (E.D. Tex. 2003) ........................................................ 21

*Castaneda v. Burger King Corp.*,
   No. C-08-4262 WHA (JL), 2009 WL 2382688 (N.D. Cal. July 31, 2009) ......... 15, 20, 22, 23

*Christensen v. Kiewit-Murdock Inv. Corp.*,
   815 F.2d 206 (2d Cir. 1987)........................................................................ 17

*Cobell v. Kempthorne*,
   455 F.3d 317 (D.C. Cir. 2006) ............................................................... 14, 17

*County of Santa Clara v. Astra USA, Inc.*,
   No. C-05-03749 WHA, 2010 WL 2724512 (N.D. Cal. July 8, 2010) ............... 17, 18

*Couture v. Hoffman-La Roche, Inc.*,
   No. C-12-2657 PJH, 2012 WL 3042994 (N.D. Cal. July 25, 2012)....................... 25

*Cram v. Elec. Data. Sys. Corp.*,
   No. 07cv1842-LAB (NLS), 2008 WL 178449 (S.D. Cal. Jan. 17, 2008)............... 17

*Davis v. Blue Cross of N. Cal.*,
   25 Cal. 3d 418 (1979) ................................................................................ 11

*Friedman v. Intervet, Inc.*,
   730 F. Supp. 2d 758 (N.D. Ohio 2010)....................................................... 13

*Gulf Oil Co. v. Bernard*,
   452 U.S. 89 (1981)................................................................................ 15, 21

*Hampton Hardware, Inc. v. Cotter & Co.*,
   156 F.R.D. 630 (N.D. Tex. 1994) ............................................................... 16

*Hinds County, Miss. v. Wachovia Bank, N.A.*,
   790 F. Supp. 2d 125 (S.D.N.Y. 2011)......................................................... 13

*In re R. M. J.*,
   455 U.S. 191 (1982).................................................................................. 15

*In re School Asbestos Litig.*,
　　842 F.2d 671 (3d Cir. 1988) ........................................................................... 21, 22

*Kerce v. W. Telemarketing Corp.*,
　　575 F. Supp. 2d 1354 (S.D. Ga. 2008) ................................................................ 20

*Kleiner v. First Nat'l Bank of Atlanta*,
　　751 F.2d 1193 (11th Cir. 1985) ........................................................................... 16

*Lilly v. Jamba Juice Co.*,
　　No. 3:13-cv-02998 JST, 2015 WL 1248027 (N.D. Cal. Mar. 18, 2015) ............... 18

*Longcrier v. HL-A Co.*,
　　595 F. Supp. 2d 1218 (S.D. Ala. 2008) ................................................................ 23

*Mevorah v. Wells Fargo Home Mortg., Inc.*,
　　No. 05-cv-1175 MHP, 2005 WL 4813532 (N.D. Cal. Nov. 17, 2005) ........... 20, 21, 23

*Ojeda-Sanchez v. Bland Farms*,
　　600 F. Supp. 2d 1373 (S.D. Ga. 2009) ................................................................. 21

*Quezada v. Schneider Logistics Transloading & Distribution*,
　　No. CV 12-2188 CAS, 2013 WL 1296761 (C.D. Cal. Mar. 25, 2013) ............. 19, 23

*Saint Agnes Med. Ctr. v. PacifiCare of Cal.*,
　　31 Cal. 4th 1187 (2003) ....................................................................................... 11

*Talamantes v. PPG Indus., Inc.*,
　　No. 13-cv-04062 WHO, 2014 WL 4145405 (N.D. Cal. Aug. 21, 2014) ........... 16, 20

*United States v. Park Place Assocs., Ltd.*,
　　563 F.3d 907 (9th Cir. 2009) ................................................................................ 11

*United States v. Schiff*,
　　379 F.3d 621 (9th Cir. 2004) ................................................................................ 15

*Valle Del Sol Inc. v. Whiting*,
　　709 F.3d 808 (9th Cir. 2013) ................................................................................ 15

*Weaver v. Pfizer, Inc.*,
　　No. 2:14-cv-0818 KJM KJN, 2014 WL 2002212 (E.D. Cal. May 15, 2014) ......... 25

*Wright v. Adventures Rolling Cross Country, Inc.*,
　　No. 12-cv-0982 EMC, 2012 WL 2239797 (N.D. Cal. June 15, 2012) .................. 21

*Zamboni v. Pepe West 48th St. LLC*,
　　No. 12 Civ. 3157(AJN)(JCF), 2013 WL 978935 (S.D.N.Y. Mar. 12, 2013) .......... 16

**STATUTES & RULES**

17 C.C.R.
    § 93120 .......................................................................................................................... 5
    § 93120.2(a) ................................................................................................................... 5
    § 93120.3(b) ................................................................................................................... 5
    § 93120.3(h) ................................................................................................................... 5
    § 93120.4(a) ................................................................................................................... 5
    § 93120.8(a) ................................................................................................................... 5
    § 93120.8(b) ................................................................................................................... 5

Cal. Civ. Proc. Code
    § 1281.2 ...................................................................................................................... 11

Fed. R. Civ. P.
    23(d)(1) ...................................................................................................................... 14

**OTHER AUTHORITIES**

3 *Newberg on Class Actions* § 9:7 (5th ed. rev. Dec. 2014) .................................................. 15, 16

Consumer Product Safety Commission, *About CPSC*, *available at*
    http://www.cpsc.gov/en/About-CPSC/ (last visited Mar. 28, 2015)........................................ 5

Knight, et al., *California Practice Guide–Alternative Dispute Resolution* ¶ 5:174
    (The Rutter Group 2014)................................................................................................ 11

*Manual for Complex Litigation* § 21.12 (4th ed. 2014) ........................................................ 16

Press Release, Global Cmty. Monitor, *Tests show flooring from Lumber Liquidators*
    *contains hazardous levsl of formaldehyde* (July 23, 2014), *available at*
    http://www.gcmonitor.org/llprop65pr/............................................................................. 2

Press Statement, *CPSC Chairman Elliot F. Kaye's Statement on Lumber Liquidators*
    (Mar. 25, 2015), *available at* http://www.cpsc.gov/en/Newsroom/Press-
    Statements/CPSC-Chairman-Elliot-F-Kayes-statement-on-Lumber-Liquidators/. .................. 6

Transcript: CPSC Chairman Elliot Kaye's Media Call on Lumber Liquidators, *available*
    *at* http://www.cpsc.gov/Global/Newsroom/CPSCPressCall03262015_FINAL.pdf ............... 6

1      **MEMORANDUM OF POINTS AND AUTHORITIES**

2    **I.      INTRODUCTION AND SUMMARY OF ARGUMENT**

3          There are now 100 similar cases filed around the country that are subject to a potential

4    multidistrict litigation ruling on May 28, 2015,[1] seventeen of them in this Court.  The Plaintiff in

5    this case, and the plaintiffs in the related *Washington* case,[2] have each brought motions attacking

6    Lumber Liquidators Inc.'s (Lumber Liquidators) free indoor air testing program.  Both say these

7    motions cannot await the Judicial Panel on Multidistrict Litigation (JPML) ruling because harm

8    could result in the meantime.  They each find different faults, and they seek contradictory relief.

9    The *Silverthorn* Plaintiff wants the Court to rewrite the program in a manner more to his liking.

10   The *Washington* plaintiffs want to end it through a preliminary injunction.

11         This Memorandum addresses *Silverthorn*, but both motions are misinformed:

12   - The indoor air testing program is an initial screening tool, from which determinations
        as to the need for follow-up and possible intervention can be made for those homes
13      that have elevated levels of formaldehyde

14   - Almost 25,000 customers have requested test kits

15   - The Consumer Product Safety Commission staff has been fully advised and reviewed
        the communications, and it requires Lumber Liquidators to report the results
16

17   - The concern over "false negatives" is misplaced

18   - It is not a test of California Air Resources Board (CARB) compliance

19   - There are no strings attached.  The program is voluntary and there is no *quid pro
        quo*—no release, no waiver, no interview, no under-oath statements, and no effect on
        participation if a class were to be certified later.
20

21         The Court should deny Plaintiff's motion.  He has not shown that anyone is being asked to

22   arbitrate claims or waive rights or that Lumber Liquidators communications with its customers

23   seek to interfere with the class action or are deceptive, misleading, or coercive; and he has shown

24   no entitlement to expedited discovery.  By contrast, Lumber Liquidators has a First Amendment

25   right to communicate truthfully with its customers.

_____

[1] *In Re: Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg., Sales
Practices & Prods. Liability Litig.*, MDL No. 2627.  The hearing is scheduled for May 28, 2015.

[2] *Washington v. Lumber Liquidators, Inc.*, No. 15-cv-1475.

1    For all the foregoing reasons, this Court should deny Plaintiff's motion.

2    **II.    FACTUAL BACKGROUND**

3         **A.    The *60 Minutes* Program.**

4         As Plaintiff puts it, "[o]n March 1, 2015, a CBS "*60 Minutes*" episode reported [that] …

5    [n]umerous samples of the product purchased both inside California and nationally failed to meet

6    their labeled CARB II standard in testing by independent certified laboratories," and "Lumber

7    Liquidators' stock price—and its sales—have plummeted…."  (Memorandum of Points and

8    Authorities in Support of Plaintiff's Emergency Motion for Protective Order ("Mot.") at 4:6-10

9    (Dkt. No. 19).)

10        **B.    These Cases Started With a "Prop 65" Case Brought by a Short Seller.**

11        There are currently 17 related cases before this Court.  The first was *Balero v. Lumber*

12   *Liquidators, Inc.*, No. 3:15-cv-01005-JST.  Six months before *Balero* was filed, class counsel in

13   *Balero* sued Lumber Liquidators in a "Proposition 65" case called *Global Community Monitor &*

14   *Sunshine Park LLC v. Lumber Liquidators, Inc.*, No. RG14733979 (Alameda Super. Ct., filed

15   July 23, 2014).  The second named plaintiff in that suit—Sunshine Park—is a newly-formed shell

16   corporation affiliated with private investment companies that took substantial short positions in

17   the stock of Lumber Liquidators.[3]

18        Another short seller, Whitney Tilson, manages three hedge funds through his company

19   Kase Capital Management.  Mr. Tilson boasted three days after the *60 Minutes* program aired that

20   it was (i) "my decision to bring the story to [*60 Minutes*]"; (ii) "[t]he three funds I manage are

21   currently short 44,676 shares of LL (a $2.3 million position based on Friday's closing price),

22   making it a 2.6% position (it was well over 3% before the stock got whacked last week)"; and

23   (iii) "I first shorted it on 10/9/13 at $102.69. My last trade was shorting more on 10/6/14 at

24   $56.06."  (Declaration of William L. Stern in Support of Defendants' Oppositions to the

25

26        [3] "Sunshine Park [is] a firm affiliated with private investment companies that have
     substantial short financial exposure to Lumber Liquidators[.]"  *See* Press Release, Global Cmty.
27   Monitor, *Tests show flooring from Lumber Liquidators contains hazardous levsl of formaldehyde*
     (July 23, 2014), *available at* http://www.gcmonitor.org/llprop65pr/.
28

1   Silverthorn Motion for Protective Order and Expedited Discovery and the Washington Motion for

2   Preliminary Injunction ("Stern Decl.") ¶ 12, Ex. C.)  Mr. Tilson also said that "I promised

3   *60 Minutes*, once I brought the story to them, that I wouldn't trade the stock until after the story

4   aired (or they told me they decided not to do it)."  (*Id.*)

5       **C.      A Cascade of Litigation and the "MDL" Proceeding.**

6           Within days of the *60 Minutes* program, scores of nearly-identical class action lawsuits

7   were filed around the county.  On March 9, 2015, plaintiffs in the related *Conte* action filed a

8   motion with the JPML.  (*See* Mot. for Consolidation & Transfer, *In Re: Lumber Liquidators*

9   *Chinese-Manufactured Flooring Prods. Mktg., Sales Practices & Prods. Liab. Litig.*, MDL No.

10  2627 (Dkt. No. 1).)  Today, there are over 90 actions subject to the JPML's forthcoming ruling.

11  No party has opposed transfer and consolidation.

12      **D.      The *Silverthorn* Motion and the Competing *Washington* Motion.**

13          On April 3, 2015, Plaintiff brought his motion for an order: (i) requiring Lumber

14  Liquidators to notify consumers of the *Silverthorn* litigation, (ii) to provide *his counsel's* contact

15  information, and (iii) expedited discovery.  (Mot. at 18:20-19:20.)  Five days later, the

16  *Washington* plaintiffs filed their motion for preliminary injunction.  (*Washington* Dkt. No. 11.)

17      **E.      The Named Plaintiff.**

18          Plaintiff James Silverthorn lives in Antelope, California, in Sacramento County.  (Compl.

19  ¶ 11.)  In August 2014, he purchased laminate flooring from Lumber Liquidators and installed it

20  in his home.  (*Id.*)  There is no declaration from Mr. Silverthorn in support of this motion, only

21  from his lawyer.  And although he claims imminent harm from Lumber Liquidators' allegedly

22  "misleading," "deceptive," and "coercive" communications, Lumber Liquidators has no record of

23  receiving any calls from him to the "800" number, nor is there any record of Mr. Silverthorn

24  logging on to Lumber Liquidators' website and signing up for a test kit.  (Declaration of Brian

25  Pullin in Support of Defendants' Oppositions to the Silverthorn Motion for Protective Order and

26  Expedited Discovery and the Washington Motion for Preliminary Injunction ("Pullin Decl.")

27  ¶ 15.)

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**F.      Background of This Product and the Regulatory Regime.**

Before addressing Plaintiff's motion, we need to first explain the product and the regulatory regime.

**1.      What is Laminate Flooring?**

This case involves laminated flooring products, which are made with a medium density fiberboard (MDF) core.  (Compl. ¶¶ 1-2.)  MDF is like particleboard, except it uses wood fiber instead of wood chips, which is combined with wax and a resin binder and formed into panels under high temperature and pressure.  MDF is stronger and denser than plywood or particleboard.  Pictured below is an MDF "core" (left) and a particleboard "core" (right):



The MDF core provides the foundation, on top of which a decorative laminate is applied.  This consists of papers decorated with an image of hardwood, usually applied with a reactive resin such as melamine-formaldehyde and a clear transparent wear layer or topcoat, which are affixed to the MDF substrate by heat and pressure.  This shows MDF with a laminate applied:



### 2. What is CARB Compliance?

Formaldehyde emissions from composite wood products (including MDF) are governed by a regulation promulgated by CARB called the Airborne Toxic Control Measure, or ATCM. 17 C.C.R. § 93120. The ATCM regulates emissions only from the "core," however, not the finished product. *See* 17 C.C.R. § 93120.2(a). That means if a core is ATCM-compliant, that core may be used to make finished goods by affixing laminate or wood veneer on top. By the same token, CARB compliance means testing the core and not the finished product.

Retailers and importers such as Lumber Liquidators may sell products that contain MDF cores that are compliant with the ATCM's emission standards. 17 C.C.R. § 93120.8(a). Lumber Liquidators must take "reasonable prudent precautions" to ensure the MDF cores in the finished products they sell comply with CARB emission standards. This includes instructing suppliers that the platforms must comply, obtaining written documentation from suppliers that the products comply, and keeping records to document the history of sales and precautions taken. 17 C.C.R. § 93120.8(b).

For manufacturers—Lumber Liquidators' Chinese suppliers of MDF—they must verify their compliance with the ATCM using third-party certified labs. These certifiers must be approved by CARB's Executive Officer. 17 C.C.R. § 93120.4(a). The third-party certifiers must also conduct quality assurance testing of the manufacturers' products (the cores) to verify that the emissions standards are met. 17 C.C.R. § 93120.3(b), (h).

In sum, CARB compliance is defined by the ATCM, which in turn regulates formaldehyde emissions *from the core only*. Manufacturers must ensure their products comply with the regulation *by testing the core* and then labeling the products as compliant.

### G. The CPSC's Involvement and Its Rejection of Deconstructive Testing.

The Consumer Product Safety Commission (CPSC) is the federal agency "charged with protecting the public from unreasonable risks [from] … consumer products."[4] On March 25,

---

[4] *See* Consumer Product Safety Commission, *About CPSC*, *available at* http://www.cpsc.gov/en/About-CPSC/ (last visited Mar. 28, 2015).

2015, the Chairman of the CPSC announced in a press conference that "[w]e are actively investigating laminate flooring products from Lumber Liquidators" and that "[t]he company has been cooperative."[5]  A news reporter asked if the CPSC plans to use deconstructive testing. Chairman Kaye said no:

> Q:  There has been a lot of debate about the type of testing that's been used.  I don't know  - there's a deconstructive test is the best one or not.  I mean, as you know, Lumber Liquidators says that's not right.  You should be looking at use in the home.  What kind of test would you be using?  Will you be using the deconstructive testing?
>
> A:  *We are not.  So we're looking at testing in a method that most closely replicates the way that the products are used in the home*.[6]

### H.   Lumber Liquidators' Indoor Air Quality Testing Program.

These are the facts concerning Lumber Liquidators' indoor air testing program.

#### 1.   The Indoor Air Test Kit.

Following the *60 Minutes* program, Lumber Liquidators saw a significant increase in calls to its "800" number.  (Pullin Decl. ¶ 2.)  In response, Lumber Liquidators initiated an air quality testing program.  The goal is to apprise concerned homeowners of the air quality readings in their homes using a recognized sampling tool administered by the customer and analyzed by an independent third-party lab.  (*Id.* ¶ 7.)  The program provides indoor air quality screening tests to customers who purchased laminate flooring sourced from China.  (*Id.* ¶ 3.)  To receive a home test kit, customers either call the "800" number or fill out an online form.  (*Id.* ¶ 5.)  As of April 21, 2015, 24,915 test kits have been sent to Lumber Liquidators' customers.  (*Id.* ¶ 6.)

#### 2.   There Are No Strings Attached.

This is a voluntary program.  (Pullin Decl. ¶ 7.)  No one is asked to give up anything.  The program is free to customers who purchased Lumber Liquidators' laminate flooring sourced from

---

[5] Press Statement, *CPSC Chairman Elliot F. Kaye's Statement on Lumber Liquidators*, (Mar. 25, 2015), *available at* http://www.cpsc.gov/en/Newsroom/Press-Statements/CPSC-Chairman-Elliot-F-Kayes-statement-on-Lumber-Liquidators/.

[6] Transcript: CPSC Chairman Elliot Kaye's Media Call on Lumber Liquidators, *available at* http://www.cpsc.gov/Global/Newsroom/CPSCPressCall03262015_FINAL.pdf (emphasis added).

China.  If anyone does not approve of the methodology, or simply does not want to participate, he or she can ignore the offer.  (*Id.*)

Customers are not asked or required to settle, release, or waive any claims in exchange for receiving or completing a home test kit.  (*Id.*)  They are not required to sign any statements under oath, or submit to an interview by defense counsel or anyone else.  (*Id.*)  And whether or not they avail themselves of the testing has no effect on whether they may still participate in a class action.

### 3.     How the Indoor Air Testing Program Works.

If the customer bought a qualifying product, his request gets routed to Customer Care. Customer Care will send that information to Building Health Check LLC (Building Health), which sends the test kit to the customer.  (Declaration of Rajiv Sahay, Ph.D. in Support of Defendants' Oppositions to the Silverthorn Motion for Protective Order and Expedited Discovery and the Washington Motion for Preliminary Injunction ("Sahay Decl.") ¶ 14.)

The test kit is made by Building Health.  (*Id.*)  It consists of a passive air sampling badge, a chain of custody form, sampling instructions, and frequently asked questions.  (*Id.* ¶ 17.) Building Health obtains these badges from three manufacturers—Advanced Chemical Sensors, Inc. (ACS), Assay Technology, Inc. (AT), and Sensors Safety Products (SSP).  (*Id.*)  Each badge contains a sampling medium consisting of silica gel coated with 2,4-dinitrophenylhydrazine (2,4-DNPH).  (*Id.*)  All three types of badges are consistent in all material respects to the requirements of passive air quality monitoring badges used by employers to determine compliance with requirements set by the Occupational Health and Safety Administration (OSHA) and the National Institute for Occupational Safety and Health (NIOSH).  (*Id.*)

Customers are provided one or more test kits depending on the square footage of their flooring (one kit for every 600 ft.²).  (Pullin Decl. ¶ 5.)  Instructions are provided along with the test kits.  (Sahay Decl. ¶¶ 15, 19.)  The instructions direct the customer to hang the badge four feet off the floor and sample for 24 hours for the best readings.  (*Id.* ¶ 19.)  EDLab maintains a toll-free number that consumers can call for support.  (*Id.*)  The customers are instructed to sample their indoor air and then send the test kit back to the lab.  (*Id.*)

1    The test kits are a reliable means of screening for elevated formaldehyde levels, as

2    demonstrated by several criteria.  They are based on established methods for sampling

3    formaldehyde in indoor air.  (*Id.* ¶ 18.)  Each type of badge has been validated by one of EDLab's

4    accredited partner laboratories or other qualified third party.  (*Id.*)  In addition to established

5    methods and analysis by accredited labs, the tests have other indicia of reliability.  The test's limit

6    of detection has been reported to be 0.003 ppm.  (Declaration of John F. McCarthy in Support of

7    Defendants' Oppositions to the Silverthorn Motion for Protective Order and Expedited Discovery

8    and the Washington Motion for Preliminary Injunction ("McCarthy Decl.") ¶ 7.)  The tests have

9    good accuracy.  (*Id.*)  The test kits have no known significant interferences from other chemicals.

10   (*Id.*)

11   Unlike CARB testing, which measures emissions from a sample piece of flooring that is

12   placed in a small vacuum chamber, the passive sampling badges provided to Lumber Liquidators'

13   customers measure actual formaldehyde concentrations in the indoor air of the customer's home.

14   The labs that analyze the results are accredited by AIHA-LAP, LLC, a leading accreditation body

15   for industrial hygiene labs for formaldehyde analysis.  (Sahay Decl. ¶¶ 8-13, 18.)  Once a test kit

16   is received by the lab, the customer is expected to be informed of the results directly by the lab

17   after a short period of time.  (*Id.* ¶ 15.)

18   After the analysis is complete, customers will receive test results via email (or U.S. Mail if

19   no email address is provided) from the lab.  (Pullin Decl. ¶ 8.)  Lumber Liquidators will also

20   receive customers' test results from the lab.  (*Id.*)

21   Lumber Liquidators receives the test results for two reasons.  First, it is required to share

22   the test results with the CPSC and with other government authorities.  (Declaration of William F.

23   Tarantino in Support of Defendants' Oppositions to the Silverthorn Motion for Protective Order

24   and Expedited Discovery and the Washington Motion for Preliminary Injunction ("Tarantino

25   Decl.") ¶ 6.)  Second, the data helps Lumber Liquidators ensure good customer service, including

26   to allow Lumber Liquidators to help the customer determine whether additional steps need to be

27   taken with respect to each individual's flooring or indoor air quality.   (Pullin Decl. ¶¶ 8-9.)

28

Defs.' MPA in Opp'n to Pl.'s Mot. for Protective Order and Expedited Discovery
Case No. 4:15-cv-01428 JST
sf-3526656

8

Customer Care will send out different follow-up letters depending on the test results.  (*Id.* ¶ 10.)  One letter is sent to customers whose results show formaldehyde levels under 0.040 parts per million.  (*Id.* Ex. A.)  A second is sent to customers whose results are between 0.040 and 0.080 parts per million.  (*Id.* Ex. B.)  And a third is sent to customers whose results are above 0.080 parts per million.  (*Id.* Ex. C.)   These different letters ensure that customers with elevated formaldehyde levels receive the appropriate degree of personal attention from customer care.  (*Id.* ¶ 10.)

For customers who receive test results with elevated levels (above 0.080 parts per million), they will receive a letter and an affirmative phone call from a customer service representative who will administer a test validation form (i.e., a survey).  (*Id.* ¶ 11.)  The validation form was designed by a certified industrial hygienist; its purpose is to assess whether there were any material errors with how the customer used the sampling badge and to identify the specific source of elevated formaldehyde levels in the customer's home.  (Tarantino Decl. ¶ 7.)  Customers in the median range will also receive a survey if they call with additional questions or want more detailed information than what is provided in the customer service FAQs.  (Pullin Decl. ¶ 11.)

Customer care will continue to work with customers who have completed the test validation form, which begins the process of ensuring that the customer is satisfied with his or her air quality and that his or her floors are safe.  (*Id.* ¶ 12.)  That could entail any number of individual measures, depending on individual circumstances.  (*Id.*)

### 4.     CPSC Staff Has Reviewed the Program and Communications.

As part of Lumber Liquidators' efforts to cooperate fully with the CPSC, Lumber Liquidators has shared details regarding its home formaldehyde testing with CPSC staff.  (Tarantino Decl. ¶ 4.)  The company has sought and received feedback on the customer communications Plaintiff seeks to enjoin.  (*Id.* ¶ 5.)  For example, Lumber Liquidators sent to the CPSC its proposed communications to customers, (*id.*), which are attached to Mr. Pullin's Declaration as Exhibits A-C.  It also sent copies of proposed communications from EDLab enclosing the customer's formaldehyde test results.  (*Id.*)  The CPSC staff's comments were

1   incorporated into the final letters.  (*Id.*)  As the CPSC official stated in making those comments

2   on the communications, "[s]taff comments are focused on improving the value of information

3   being provided to consumers."  (*Id.*)

4   **III.   ARGUMENT**

5         Plaintiff asks the Court for three forms of provisional relief to: (i) block arbitration for

6   customers who avail themselves of Lumber Liquidators' free indoor air testing program,

7   (ii) oversee Lumber Liquidators' communications concerning that program, and (iii) take

8   expedited discovery.  All of this, Plaintiff says, is required before the JPML decides the transfer

9   motion on May 28.

10         Plaintiff is wrong.  The Court should deny Plaintiff's motion.

11       **A.   Plaintiff's Arbitration Allegation Is a Non-Issue.**

12         Plaintiff contends that customers who sign up for Lumber Liquidator's indoor air quality

13   testing program through Lumber Liquidators' website might unwittingly be assenting to arbitrate

14   their claims.  (Mot. at 1:22-28.)  Not so.  No one is being asked to arbitrate his or her claims.

15   Lumber Liquidators made this clear on April 2, 2015, when its counsel emailed Plaintiff's

16   counsel, Mr. McGuinness:

17           ***Lumber Liquidators will not seek to enforce the arbitration or venue
18           clauses pursuant to the T&Cs on the Lumber Liquidators' website***, either
        in *Silverthorn* or in any of the related cases that are now, or might become
        part of, the "related" cases filed in the Northern District of California or *In
19           Re: Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg.,
        Sales Practices & Prods. Liab. Litig.*, MDL No. 2627. ***We are waiving
20           those clauses.***

21   (Stern Decl. ¶ 14, Ex. B (emphasis added).)  As Mr. McGuinness admits, "Lumber Liquidators

22   agreed not to seek to enforce the venue or arbitration provisions of the website's terms and

23   conditions in this or any related litigation….."  (*See* McGuinness Decl. ¶ 10 (Dkt. No. 20-1).)

24         This ought to have ended the issue.  Yet, arbitration is nevertheless part of Plaintiff's

25   motion.  (Mot. at 7:12-15 ("a class member ordering the Lumber Liquidators air quality test kit is

26   arguably waiving his or her rights to file a lawsuit").)  Apparently, Plaintiff believes that nothing

27   less than a court-filed order will suffice to waive arbitration.  If so, Plaintiff is mistaken.

28

Defs.' MPA in Opp'n to Pl.'s Mot. for Protective Order and Expedited Discovery
Case No. 4:15-cv-01428 JST
sf-3526656

10

First, Plaintiff is wrong as a legal matter.  No particular form of waiver is required, least of all a court-filed stipulation.  Cal. Civ. Proc. Code § 1281.2.  All that has to be shown for waiver is the "voluntary relinquishment of a known right."  *Saint Agnes Med. Ctr. v. PacifiCare of Cal.*, 31 Cal. 4th 1187, 1195 n.4 (2003); *see also United States v. Park Place Assocs., Ltd.*, 563 F.3d 907, 921 n.10 (9th Cir. 2009) (similar rule under the Federal Arbitration Act).  Indeed, most reported waiver cases do not involve court filings at all, but, rather, a party's inaction occurring *outside* of court, usually the failure to invoke arbitration timely.  *See Davis v. Blue Cross of N. Cal.*, 25 Cal. 3d 418, 425 (1979); *see generally* Knight, et al., *California Practice Guide–Alternative Dispute Resolution* ¶ 5:174 (The Rutter Group 2014).

Plaintiff does not quarrel with the form of Lumber Liquidators' waiver.  It is in writing, and it is express.  Plaintiff does not contend that it is ineffective, ambiguous, or non-binding.

Second, Plaintiff is also wrong factually.  In the meet-and-confer prior to filing this motion, Plaintiff's counsel offered to accept less than a filed stipulation so long as the waiver was "unequivocal."  (Stern Decl. Ex. A.)[7]  Lumber Liquidators invited Plaintiff to explain in what manner Lumber Liquidators' express waiver was deficient or "equivocal," but Plaintiff has not responded except to say that Lumber Liquidators needed to sign Plaintiff's proposed stipulation.  (Stern Decl. ¶¶ 6-7.)  Although he forwarded a stipulation, Mr. McGuinness undermined himself by including a disclaimer saying that he had no authority to sign.  (*Id.* ¶ 8, Ex. B.)

The demand for a court order is perplexing.  Class counsel may be demanding it because it may be useful in the positioning to become "Lead Counsel."  If so, counsel's personal ambitions should not be mistaken for legal necessity.

Third, even if arbitration were still at issue, Plaintiff makes no showing that a decision on waiver "require[s] this Court's attention prior to the resolution of the JPML proceeding."  (*Cf.*

---

[7] As he put it:  "Finally, if your client is not prepared to stipulate to entry of the attached proposed orders, but is willing to unequivocally stipulate that it will not assert—and will irrevocably waive—any right to enforce the venue or arbitration terms contained on its website in connection with named plaintiffs and putative class members who visit the site in connection with the solicitation of, consideration of, or participation in the FOSC program, please advise."  (Stern Decl. Ex. A.)

1   Order re Mot. to Extend Time ("*Balero* Order") at 2:17-19, *Balero v. Lumber Liquidators, Inc.*,

2   No. 15-cv-1005 (*Balero* Dkt. No. 32).)  No one is at risk of having his or her case arbitrated

3   between now and when the JPML rules.  Currently, this case is proceeding judicially.  If that were

4   to change, Lumber Liquidators would have to file a motion to compel arbitration—which it has

5   no intention of doing.  But even assuming that were to happen, waiver could be decided at such

6   time.  Plaintiff has not shown that the issue of waiver has to be decided before the JPML rules.

7        The arbitration/venue clause affords no basis for interim relief.

8        **B.    Plaintiff Has Adduced No Facts Warranting Court Supervision Over
              Defendants' Communications With Concerned Customers.**

9

10       Plaintiff's motion also seeks interim relief to address perceived shortcomings in Lumber

11   Liquidators' indoor air testing program.  But his criticism is uninformed and unsubstantiated.

12       Plaintiff's misunderstanding of the program stems from two sources:  (i) An NBC

13   television story and (ii) Plaintiff's lawyer's interpretation of the product instructions.  (Mot. at

14   7:16-8:18.)  From these, Plaintiff concludes that Lumber Liquidators' testing protocol is not

15   "normal," (*id.* at 8:5-18), and demands that the Court police Lumber Liquidators'

16   communications in order to (i) avoid waiver of class members' rights, (ii) avoid solicitation of

17   settlements or releases, and (iii) avoid misleading communications.  (*Id.* at 15:3-14.)

18       Let's take a closer look at these charges.

19            **1.    Plaintiff Has No Evidence That Anyone's Rights Are Being Waived.**

20       Plaintiff worries that, without court intervention, putative class members could be waiving

21   their rights.  If by "waiver of rights" Plaintiff is referring to the arbitration provision, Lumber

22   Liquidators has shown that is not an issue.  If Plaintiff means waiver of some other rights, he is

23   wrong again.

24       In the first place, what "rights" does Plaintiff worry are being waived?  Plaintiff doesn't

25   say.  That is because Plaintiff is uninformed.  There are no company records of Plaintiff ever

26   speaking to anyone at Lumber Liquidators.  (Pullin Decl. ¶ 15.)  And there is no declaration by

27   Plaintiff, only his lawyer.  The Court may presume, therefore, that Plaintiff never called Lumber

28   Liquidators' "800" number; never logged on to Lumber Liquidators' website; never asked for a

free indoor air test kit; never read any literature about the indoor air testing program such that Plaintiff might have been misled, deceived, or coerced by the "communications" Plaintiff seeks to restrict.  Moreover, Plaintiff never claims that Lumber Liquidators solicited him to arbitrate, settle, or waive any rights, and Plaintiff was never asked to opt out of a class action lawsuit. Plaintiff's concerns are imaginary.

In the second place, none of Plaintiff's assertions are true.  This is a voluntary program for customers who have purchased Chinese-made laminate flooring from Lumber Liquidators.  (*Id.* ¶ 7.)  No one is asked to give up anything.  The program is free to customers.  Its goal is to apprise concerned homeowners of the air quality readings in their homes using a recognized sampling tool administered by the customer and analyzed by an independent third-party lab.  For those customers whose readings are above 0.080 parts per million, or who have continuing concerns, Lumber Liquidators is reaching out to them with plans to analyze a sample of their laminate flooring to assess what further action, if any, may be warranted.  (*Id.* ¶ 12.)   If Plaintiff (or anyone else) doesn't approve of the methodology or the science, or simply doesn't want to participate, he can ignore the offer.  (*Id.* ¶ 7.)  Alternatively, consumers can avail themselves of the testing and still participate in a class action should one be certified.  (*Id.*)

The cases Plaintiff cites undermine him.  They hold that communications with class members are prohibited only if they "encourag[e] individuals not to join the suit."  (*See* Mot. at 15:23-16:11 [and cases cited].)[8]  None of these things is happening here.

---

[8] For example, Plaintiff cites *Friedman v. Intervet, Inc.*, 730 F. Supp. 2d 758, 765 (N.D. Ohio 2010).  (Mot. at 14:20-23.)  In *Friedman*, it was misleading for the defendant in a product liability case to obtain releases from putative class members without informing them of the litigation.  That is not happening in these communications.  In any event, the *Friedman* court did not invalidate the releases, finding that this could await class certification.  730 F. Supp. 2d at 767.

Likewise, in *Hinds County, Mississippi v. Wachovia Bank, N.A.*, 790 F. Supp. 2d 125 (S.D.N.Y. 2011), the court held that the defendant bank was free to enter into individual settlements because "plaintiff has no legally protected right to sue on behalf of other [potential plaintiffs] who prefer to settle," because "potential class members may leave the putative class at will."  *Id.* at 133 (citations and internal quotations omitted).  Again, *Hinds County* is of no moment because the purpose of these communications is informational, not to get consumers to enter into releases, though that too would be perfectly lawful.

Here, the communications to Lumber Liquidators customers do not discourage putative class members from joining the lawsuit.  The test instructions and letters from Lumber Liquidators and the lab do not even mention the litigation.  Plaintiff's claim that the challenged communications seek a waiver of consumers' rights is contrary to fact.

### 2.   The CPSC's Oversight Eliminates Concerns About Public Health.

The Court need not be concerned from a public safety standpoint.  The concern over "false negatives"—the chance that someone whose home emits high levels of formaldehyde will escape detection by taking advantage of Lumber Liquidators' testing program—is misplaced. (McCarthy Decl. ¶¶ 8-9.)  Moreover, Lumber Liquidators has fully disclosed this program to CPSC staff, who understand the protocol and testing methodology and the identity of the independent third-party lab that is overseeing the testing, as well as the AIHA-LAP, LLC accredited partner laboratories analyzing the samples.  (Tarantino Decl. ¶ 4.)  As for misleading messages, CPSC staff has reviewed the letters that customers will receive.  (*Id.* ¶ 5.)

Not so fast, Plaintiff will say, the CPSC may know a thing or two about public safety but the Court must decide if Lumber Liquidators is tampering with the class.  Plaintiff will argue that Court oversight is needed to avoid other, non-health related communications that might be misleading, and it must do this now before the JMPL rules.  (Mot. at 15:3-14.)  Plaintiff is wrong.

### 3.   Plaintiff Has No Evidence of Improper Communications.

Plaintiff also has no evidence that Lumber Liquidators is disseminating misleading communications.  We discuss each of Plaintiff's accusations separately.

### a.   Plaintiff Cannot Require Defendants to Carry His Messages.

Under Rule 23(d), a court "may issue orders" that "require – to protect class members and fairly conduct the action – giving appropriate notice to some or all class members of . . . any step in the action, …."  Fed. R. Civ. P. 23(d)(1).  However, this power to issue notices is limited to protecting "class members' right to participate in the litigation.  [I]t does not authorize substantive orders protecting the very rights class members seek to vindicate."  *Cobell v. Kempthorne*, 455

1   F.3d 317, 324-25 (D.C. Cir. 2006).  Rule 23(d) cannot be used to hijack perfectly lawful

2   communications and force a defendant to carry notice of plaintiff's litigation position.  *Id.*

3       What, then, is a lawful communication?  Because of the First Amendment, courts will

4   normally not interfere in a defendant's pre-certification communications with absent class

5   members.[9]  *See Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981).[10]  The two exceptions are

6   where the communications (i) are misleading, deceptive, or coercive, or (ii) undermine the class

7   action by convincing potential class members to avoid the representative suit.  3 *Newberg on*

8   *Class Actions* § 9:7 (5th ed. rev. Dec. 2014).

9       To restrict communications on either basis, a court must make specific findings.  *Id.*; *Gulf*

10  *Oil*, 452 U.S. at 101; *accord Castaneda v. Burger King Corp.*, No. C-08-4262 WHA (JL), 2009

11  WL 2382688, at *6 (N.D. Cal. July 31, 2009) (Larson, M.J.).  As the Manual on Complex

12  Litigation explains, "[j]udicial intervention [in communications with putative class members] is

13  generally justified only on a clear record and with specific findings that reflect a weighing of the

14  need for a limitation and the potential interference with the rights of the parties.  Such

15  intervention 'should result in a carefully drawn order that limits speech as little as possible,

16      [9] Commercial speech is protected by the First Amendment, and thus generally may not be

17  enjoined, unless the party seeking the injunction demonstrates "that it is fraudulent," or "that [it]
    will incite imminent lawlessness," or if that the "speech . . . aids or abets criminal activity . . . ."

18  *United States v. Schiff*, 379 F.3d 621, 626 (9th Cir. 2004).  The party seeking to silence
    commercial speech "bears the burden of showing that [such restriction serves] a substantial

19  [governmental] interest, that the restriction directly advances that interest and that the restriction
    is not more extensive than necessary to serve the interest."  *Valle Del Sol Inc. v. Whiting*,

20  709 F.3d 808, 816 (9th Cir. 2013).  In fact, even where the Court finds the speech misleading, it
    "may not place an absolute prohibition . . .  if the information also may be presented in a way that

21  is not deceptive."  *In re R. M. J.*, 455 U.S. 191, 203 (1982).  Thus, the less restrictive and
    "preferred remedy" for any misstatement "is more disclosure, rather than less."  *Id.* at 201

22  (internal quotation marks omitted).  Because Plaintiff cannot show that Lumber Liquidators'
    communications are misleading, much less that they are actually false or fraudulent, he cannot

23  satisfy his heavy burden to show that his requested broad injunctive relief is necessary or
    appropriate.  *See Schiff*, 379 F.3d at 626.

24      [10] *Gulf Oil* was a racial discrimination class action.  A unanimous Supreme Court held that

25  a district court abused its discretion by entering an order that banned nearly all communications
    between parties or their counsel and actual and potential class members.  In that case, the defendant

26  began to send notices to the affected employees offering back pay in exchange for a release of
    claims.  The Supreme Court held that "an order limiting communications between parties and

27  potential class members should be based on a clear record and specific findings that reflect a
    weighing of the need for a limitation and the potential interference with the rights of the parties."

28  452 U.S. at 101.

1  consistent with the rights of the parties under the circumstances.'" *Manual for Complex*

2  *Litigation* § 21.12 (4th ed. 2014).

3      Neither exception applies.  To that, we now turn.

4      **b.**    **There Is No Evidence That Defendants' Communications Seek to Interfere With the Putative Class Action.**

5

6      Starting with the second exception—tampering with the class action process—Plaintiff

7  has no evidence that Lumber Liquidators is using the testing program to solicit opt-outs or

8  otherwise interfere with the class action process.[11]  Simply, put, these communications do not

9  solicit settlements or releases.  (Pullin Decl. ¶ 7.)  There are "no strings attached" to a consumer

10  availing him or herself of the program.  (*Id.*)

11      As it happens, communications—even about the litigation—would be perfectly lawful.

12  "[C]ourts usually start from a baseline premise that defendants generally may voice their views

13  concerning the litigation as long as it does not convey an incomplete or deceptive view of the

14  proceedings."  Newberg, *supra*, § 9:7; *accord Atari v. Super. Ct.,* 166 Cal. App. 3d 867, 872-73

15  (1985); *Talamantes v. PPG Indus., Inc..*, No. 13-cv-04062 WHO, 2014 WL 4145405, at *5 (N.D.

16  Cal. Aug. 21, 2014) (Orrick, J.) (employment case, holding that email communications to putative

17  class members discussing the litigation not coercive or misleading); *see also Zamboni v. Pepe*

18  *West 48th St. LLC,* No. 12 Civ. 3157(AJN)(JCF), 2013 WL 978935, at *3 (S.D.N.Y. Mar. 12,

19  2013) ("In general, communications that are litigation-neutral—that do not alter the legal

20  relationship between the defendants and members of a putative class—are not subject to

21  restriction.").[12]

22

23      [11] *Cf. Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1203 (11th Cir. 1985) (holding that the district court had authority under Rule 23(d) to forbid the defendant bank from soliciting exclusion requests from potential class members); *Hampton Hardware, Inc. v. Cotter & Co.*, 156 F.R.D. 630, 632-33 (N.D. Tex. 1994) (holding that letters from the defendant to potential class members warning of potential costs of litigation and advising not to participate in the suit were an improper "attempt to prevent member participation in the class action").

24

25

26      [12] Newberg goes on to say that "courts generally permit the defendant and defendant's counsel to communicate directly with these absent putative class members before a class action is certified.  Defendants may generally gather information about the putative class action and also may normally enter into settlements with individual potential class members prior to class certification."  Newberg, *supra*, § 9:7.

27

28

Defs.' MPA in Opp'n to Pl.'s Mot. for Protective Order and Expedited Discovery
Case No. 4:15-cv-01428 JST
sf-3526656

16

1    Thus, on the one hand, Lumber Liquidators would be perfectly within its First

2    Amendment rights to discuss the class action litigation and the issues it raises.  It could have used

3    the opportunity to debunk the bogus deconstructive testing that Plaintiff insists is the only correct

4    way to test for formaldehyde.  Yet, it has not used the communications related to the testing

5    program, such as the test instructions and letters to customers, to do so.  These communications

6    are silent about the litigation, the issues, and silent too about opting out.

7    On the other hand, if it is the *absence* of mention of the litigation that Plaintiff finds

8    offensive, Plaintiff must lose as well.  A defendant's failure to mention litigation in pre-

9    certification communications is not misleading.  *Cram v. Elec. Data. Sys. Corp*., No. 07cv1842-

10   LAB (NLS), 2008 WL 178449, at *3 (S.D. Cal. Jan. 17, 2008).  And as noted above, Rule 23(d)

11   cannot be used to force Lumber Liquidators to convey Plaintiff's litigation messages.  *Cobell*, 455

12   F.3d at 324-25.

13           **c.**　　**There Is No Evidence That Any Putative Class Member Is**
      　　　　　　　**Being Asked to Change His/Her Legal Position.**

14

15   Plaintiff next suggests that Lumber Liquidators is initiating "one-sided communications

16   that threaten to compromise the rights of putative class members and which omit material

17   information about pending litigation." (Mot. at 16:21-17:2.)  But Plaintiff has no evidence.  And,

18   as noted above, even if the intent of these communications were to induce individual settlements

19   and releases—they are not—that would be protected as long as they are not misleading.  *See*

20   *Christensen v. Kiewit-Murdock Inv. Corp*., 815 F.2d 206, 213 (2d Cir. 1987) ("[A]t least prior to

21   class certification, defendants do not violate Rule 23(e) by negotiating settlements with potential

22   members of a class.")

23   The case Plaintiff cites to the contrary, *County of Santa Clara v. Astra USA, Inc.,* No. C-

24   05-03749 WHA, 2010 WL 2724512 (N.D. Cal. July 8, 2010), only highlights what our case is not

25   about.  In *County of Santa Clara*, Judge Alsup found that defendant crossed the line by

26   unilaterally sending refund payments to putative class members that operated as accord-and-

27   satisfaction and a release of claims.  Nothing like that is charged here.  Moreover, the statements

28   in *County of Santa Clara* were profoundly misleading.  The defendant failed to inform recipients

1   (i) that the appellate court had "already vetted" plaintiff's theory of the case that could have

2   netted a larger payout, (ii) how the refund calculations were made, (iii) the strengths of plaintiffs'

3   claims, and (iv) how closely the check amounts aligned with plaintiffs' theory. *Id*. at *4.  In

4   short, the defendant was inviting class members to change their legal positon while only telling

5   half the story. *Id*.

6        Here, neither is happening.  There is no invitation to sign releases.  By requesting a free

7   indoor air test kit, no one is asked to change his or her legal position.  (Pullin Decl. ¶ 7.)  These

8   tests are free, voluntary, and unconditional.  There are no strings attached.

9        This Court recently addressed a similar concern—whether notifying absent class members

10  of litigation was required—in *Lilly v. Jamba Juice Co.*, No. 3:13-cv-02998 JST, 2015 WL

11  1248027, at *8-9 (N.D. Cal. Mar. 18, 2015).  That arose in the context of court approval of a class

12  action settlement of a "Rule 23(b)(2)" claim seeking injunctive relief only.  This Court said no,

13  because "the rights of absent class members were [not] compromised in any way." *Id*.  Likewise,

14  in this case, putative class members are not being asked to release, settle, or compromise

15  anything.  Under the reasoning of *Lilly*, no notice would be required to class members.  It follows,

16  then, that court supervision of the communications is not required.

17              **d.      There Is No Evidence That Defendants' Communications Are**
                          **Misleading.**
18

19       What about the second exception, misleading, deceptive, or coercive communications?

20  Let's first consider "misleading" and "deceptive."  Plaintiff asserts that the program runs the risk

21  of a class member becoming confused that "he or she could communicate confidential

22  information to [defendants' lawyers] without negative consequences."  (Mot. at 17:6-9 (citation

23  omitted).)  Plaintiff says "Lumber Liquidators is … using the FOSC program to gain ex parte

24  access to class members' private indoor air contamination data, outside of any discovery

25  process…." (*Id.* at 17:13-17.)  There is much amiss in this charge.

26       What "confidential information" is Plaintiff concerned about divulging?  Plaintiff says it

27  is his indoor air test results.  (*Id.*)  But he has not asked to participate in the free indoor air testing

28

1  program, and lacks standing to complain about an imaginary wrong that didn't happen to him. In

2  any event, Plaintiff never explains how indoor air test results are "confidential."

3        Lumber Liquidators needs access to the test results for two reasons.  First, it is required to

4  share those test results with the CPSC and with other government authorities.  (Tarantino Decl.

5  ¶ 6.)  Second, Lumber Liquidators has a strong commitment to its customer service and wants to

6  know if customers have any complaints, questions, or concerns about anything—whether it be

7  discourteous sales personnel, questions about installation, or formaldehyde.  (Pullin Decl. ¶ 9.)

8  After the *60 Minutes* story, customers contacted Lumber Liquidators with concerns about

9  formaldehyde emissions.  Even in the absence of litigation, Lumber Liquidators would feel

10  obligated, in the ordinary course of business, to investigate and address their concerns.  (*Id.*)  It

11  cannot properly serve its customers if denied access to those testing results.  (*Id.*)

12        Plaintiff begs to differ and wants the court to "prohibit[] the testing company from sharing

13  the results with Lumber Liquidators."  (Mot. at 17:13-17.)  Plaintiff cites *Quezada v. Schneider*

14  *Logistics Transloading & Distribution*, No. CV 12-2188 CAS (DTBx), 2013 WL 1296761 (C.D.

15  Cal. Mar. 25, 2013).  If *Quezada* sheds light on this issue, it is only to illuminate how far afield

16  Plaintiff has strayed.

17        *Quezada* was a wage/hour class action.  After the complaint was filed but before class

18  certification, (i) the defendant's lawyers (ii) personally interviewed putative class members

19  (iii) without telling them that the purpose of the interview was to gather evidence to be used

20  against them in litigation, (iv) or that the document they were asked to sign at the close of the

21  "interview" was a sworn declaration.  Rather, (v) they were told that the interview was merely for

22  the purpose of an "internal investigation."  2013 WL 1296761, at *5.  Not a single one of the five

23  *Quezada* circumstances arises on our facts.  By contrast:

24        •   CPSC staff has reviewed the indoor air quality program and the communications.

25        •   No one is interviewing putative class members.

26        •   No one is signing sworn statements at the end of the process.

27        •   Lumber Liquidators' lawyers are not speaking directly to anyone.

28

Defs.' MPA in Opp'n to Pl.'s Mot. for Protective Order and Expedited Discovery
Case No. 4:15-cv-01428 JST
sf-3526656

19

- There is no "advocacy" of Lumber Liquidators' litigation position (*cf*. Mot. at 18:16); to the contrary, the litigation is not mentioned.

- The aim of the communications is not to induce statements to be used in the litigation but to assess the air quality of customers who have concerns.

Judge Orrick's recent ruling in *Talamantes v. PPG Industries, Inc.*, No. 13-cv-04062 WHO, 2014 WL 4145405 (N.D. Cal. Aug. 21, 2014) is instructive.  That was a Fair Labor Standards Act employment case in which, after the court certified a class, the defendant sent an email to class members.  The email stated that at all times the employees had been properly classified, explained why they had been classified as exempt, and notified them that they would be receiving notice of the class action.  Plaintiff challenged these communications. *Id*. at *2.  The court declined to find them misleading because the communications "did not condition continued employment on not joining the action, nor did it malign the plaintiff's position." *Id.* at *4; *accord Castaneda*, 2009 WL 2382688, at *6 (permitting unsupervised interviews of absent class members by defense counsel on the subject of the litigation); *Kerce v. W. Telemarketing Corp.*, 575 F. Supp. 2d 1354, 1367 (S.D. Ga. 2008) ("There is no evidence that West misrepresented facts about the lawsuit [to sixteen potential class members who filed declarations on behalf of West], discouraged participation in the suit, or undermined the class' confidence in, or cooperation with, class counsel.").

Notably, the *Talamantes* court distinguished four of the cases on which Mr. Silverthorn relies. (Mot. at 15:22-16:11; 18:5:17.)  As Judge Orrick observed in *Talamantes*, those were all employment cases that involved profoundly misleading employer communications.  This is a recap of the facts and the holdings of those cases:

- *Mevorah v. Wells Fargo Home Mortgage, Inc.*, No. 05-cv-1175 MHP, 2005 WL 4813532, at *3 (N.D. Cal. Nov. 17, 2005),[13] was an employment case in which the employer's communications with putative class members/employees stated that the aim of the lawsuit was to convert them from salaried to hourly position—that was patently untrue, and Judge Patel made specific findings that class members were misled. *Id.* at *4.  Even so, the court's order restricted *both* sides from future communications with putative class members "regarding this action" but did not preclude communications "undertaken in the regular course of business." *Id*. at *5.

---

[13] Cited by Plaintiff at Mot. at 14:18-21.

1

- *Wright v. Adventures Rolling Cross Country, Inc.*, No. 12-cv-0982 EMC, 2012 WL 2239797, at *5-6 (N.D. Cal. June 15, 2012),[14] was another employment case. Defendant's representative sent an email asking the employees to make a statement disavowing involvement with the class and characterizing the lawsuit as a "legal fishing expedition" that could drive the company out of business; as well as calling class counsel "unethical." *Id.* at *4. Defendant's president separately wrote and threatened them with financial exposure if they continued to litigate. *Id.* The court found these communications to be misleading, but like Judge Patel in *Mevorah*, Judge Chen prohibited future communications only "regarding this litigation" and not "from communicating with potential class members on purely business-related matters." *Id.* at *5.

2

3

4

5

6

7

- *Belt v. Emcare, Inc.*, 299 F. Supp. 2d 664, 666-67 (E.D. Tex. 2003),[15] another employment case. The court found defendant's letter to putative plaintiffs misleading in five respects, including misrepresenting the amounts potentially at stake, equating the case to a medical malpractice action (the company was in the medical business), and threatening class members' job security.

8

9

10

- *Ojeda-Sanchez v. Bland Farms*, 600 F. Supp. 2d 1373 (S.D. Ga. 2009),[16] another FLSA/employment case. Defendant's representatives made telephone calls and in-person visits to the Mexican homes of three "H-2A" (seasonal) workers, demanding that they sign statements under oath disavowing participation in the lawsuit, upon threat of termination, statements that the workers later said were untrue. *Id.* at 1377-78. The court found these communications misleading and restricted them. *Id.* at 1381.

11

12

13

14

Nothing close to the facts in *Mevorah/Wright/Belt/Ojeda* is present here. If those cases

15

teach us anything, it is that the challenged communications in this case contrast sharply with

16

those communications and are perfectly lawful under *Gulf Oil*. Lumber Liquidators does not

17

"advocate" *any* position let alone even mention the litigation in its letters to consumers;

18

participation is voluntary and unconditional; no one is being asked to sign a statement or change

19

his or her legal position; and the communications are the sort of "regular course of business"

20

communications between a retailer and its customers that the First Amendment protects.

21

Plaintiff relies on *In re School Asbestos Litigation*, 842 F.2d 671 (3d Cir. 1988), and says

22

that it "bears a number of similarities to Lumber Liquidators' free air home test kit program."

23

(Mot. at 21:2-4.) Plaintiff accuses Lumber Liquidators of using the program to present its "own

24

25

26

[14] Cited by Plaintiff at Mot. at 16:2-6; 18:11-14.

27

[15] Cited by Plaintiff at Mot. at 16:5-6; 17:27-18:4.

28

[16] Cited by Plaintiff at Mot. at 14:26-15:2; 18:5-11.

1   views (i) on the risks of formaldehyde, and (ii) the asserted compliance of its products with

2   industry formaldehyde standards."  (*Id.* at 21:5-7.)  This is a gross overreach.

3        The program communications are not advocacy.  There is nothing about Lumber

4   Liquidators' "own views" being presented nor any mention of its compliance (or lack thereof)

5   with any emission standards.  Moreover, any statements in the results letters about "normal air"

6   were reviewed by CPSC staff and are carefully drawn from World Health Organization and other

7   established standards.  (Tarantino Decl. ¶ 5; McCarthy Decl. ¶ 10.)[17]

8        *School Asbestos* is also distinguishable and illustrates by contrast what these

9   communications cases are not.  There, the defendants sent a booklet to putative class members

10  (school district and other public officials) that was prepared by an association comprised entirely

11  of the defendants, all of them manufacturers of products that included asbestos.  The booklet

12  purported to convey accurate information about asbestos written by a neutral source, but it did no

13  such thing.  It concluded that (i) the presence of asbestos in buildings rarely poses a health hazard,

14  (ii) asbestos removal is often not an appropriate response, and (iii) alternatives to removal should

15  be seriously considered.  842 F.2d at 675.  The district court specifically found the booklet

16  misleading, and required the association to make known its relationship to defendants whenever it

17  spoke in any manner to any person or group reasonably believed to include class members.

18  842 F.2d at 684.  The lesson from *School Asbestos* is:  If a defendant is going to engage in

19  advocacy to putative class members, it must be truthful and it must disclose its identity.

20       As noted already, there is no advocacy.  The litigation is not mentioned on Lumber

21  Liquidators' letters to consumers regarding the testing, the test instructions, etc.  Lumber

---

23       [17] Plaintiff's concern about these communications becoming a "conduit to oral
24  communications between [Lumber Liquidators'] customer service department and class
    members," (Mot. at 21 n.24), is not only hypothetical, it is not a basis for restriction.  As noted
25  above, a defendant may communicate with putative class members in the ordinary course of
    business and may even communicate about the litigation.  *See Castaneda*, 2009 WL 2382688, at
26  *7 ("Both parties are permitted to take pre-certification discovery, including discovery from
    prospective class members."); *Austen v. Catterton Partners V, LP*, 831 F. Supp. 2d 559, 567
27  (D. Conn. 2011) ("Both parties need to be able to communicate with putative class members—if
    only to engage in discovery regarding issues relevant to class certification—from the earliest
28  stages of class litigation.").

1    Liquidators is not hiding behind an association to convey a false message, rather, its

2    communications say they are from "Lumber Liquidators."  Indeed, no one can be fooled about

3    that, because everyone who participates must either sign up through Lumber Liquidators' website

4    or through its Customer Care "800" number.  Moreover, the customers are contacting Lumber

5    Liquidators; Lumber Liquidators is not actively seeking out its customers and asking them to sign

6    up for the home air test kit.  There is no hidden identity, false pretenses, advocacy, and no

7    "Trojan horse" behind these communications.  (*Cf.* Mot. at 1:21-22.)

8                    **e.       There Is No Evidence of Coercion.**

9            This brings us to the final exception, coercive communications.  Plaintiff cites this prong,

10   (*see* Mot. at 16:6-20), but offers no facts and does not seriously mount an argument that these

11   communications are coercive.  Nevertheless, we will debunk this charge as well.

12           Coercive communications are ones in which there is a *quid pro quo*—"do this or else."

13   *See Quezada*, 2013 WL 1296761, at *4.  But Plaintiff has no evidence, and no amount of

14   discovery will uncover any because there is no *quid pro quo*.  (Pullin Decl. ¶ 7); s*ee Longcrier v.*

15   *HL-A Co.*, 595 F. Supp. 2d 1218, 1227 (S.D. Ala. 2008) ("In tracing out the fault line between

16   conduct which warrants restrictions and conduct which does not, it bears emphasis that mere

17   inherent coerciveness in the employment relationship is insufficient, in and of itself, to warrant

18   imposition of limitations on employers' ability to speak with potential class members prior to

19   certification.").

20           In employment cases, some courts in this District and elsewhere have found a

21   circumstance of "inherent coerciveness" that requires communications to pass "heightened"

22   scrutiny.  But that rule does not extend outside employment class actions.  *Quezada*, 2013 WL

23   1296761, at *4; *Mevorah*, 2005 WL 4813532, at *4.  There is a very good reason for this, as

24   Magistrate Judge Larson explained in *Castaneda v. Burger King Corp.*, after canvassing the

25   cases:  "[I]f anything, the fact that [*Castaneda*] is a disability access case, not an employment

26   relationship, obviates many concerns for potential abuse or harassment.  There is no danger that

27   putative plaintiffs could lose their jobs either because they cooperate with class counsel or

28   because they refuse to cooperate with defense counsel." *Castaneda*, 2009 WL 2382688, at *6.

1    Substitute "false advertising" for "disability access" in the above quote and Magistrate Judge

2    Larson could have been writing about our case.

3        In the end, Plaintiff's real grievance is that these communications do not carry *his*

4    "merits*"* litigation message—that only deconstructive testing counts and that Lumber Liquidators

5    should admit guilt. This is nonsense, but now is not the time to debate the merits. Yet, this

6    motion is nevertheless revealing, because it illustrates that a "merits" determination is a necessary

7    step in the interim relief Plaintiff seeks. Unless the Court is prepared to make a "merits" ruling it

8    should deny this motion as beyond what Rule 26(d) and the First Amendment allow.

9        **C.    Plaintiff Has Not Shown Facts Warranting Expedited Discovery.**

10       As a separate form of relief, Plaintiff also seeks expedited discovery. The Court should

11   deny this for two reasons.

12       <u>First</u>, Plaintiff makes no new or different arguments, and instead makes clear that he is

13   relying on the same "foregoing reasons" that form the basis of his other requested forms of relief.

14   (Mot. at 18:20.) This is not really a different theory or different argument based on different

15   evidence. It is just a separate request for relief based on the same set of facts. It presupposes that

16   he has made a *prima facie* showing of entitlement to a court order regulating Defendants'

17   communications. As such, it stands or falls with the rest of the motion, and we have already

18   shown why that should be denied. Put differently, if the Court is not persuaded that Plaintiff has

19   met his burden of showing that Defendants' communications can be restricted, it follows that this

20   request for expedited discovery must be denied as well.

21       <u>Second</u>, there is the matter of timing. Whatever might be said about the need to restrict

22   these communications now, before the JPML issues its ruling, the motion for expedited discovery

23   has even less to commend it from the standpoint of timing. Plaintiff has made no showing

24   whatsoever that this discovery has to happen before the JPML convenes.

25       In the first place, there is no concern that evidence will be lost over the next few months.

26   The issue of preservation of evidence is already part of the April 28, 2015 case management

27   conference. (*Balero* Order at 2:13-14.) Even without a document preservation order at the CMC,

28   Lumber Liquidators is bound by the Federal Rules of Civil Procedure and has already issued

1    "litigation hold" notices, which extend to the indoor air testing program.  Plaintiff offers no

2    showing that the discovery he seeks into the indoor air testing program will be lost.

3              In the second place, the requested discovery is wildly overbroad, as it seeks merits-based

4    document requests, interrogatories, and a minimum of four depositions (of three Lumber

5    Liquidator employees plus an employee of the testing lab), not only into the indoor air testing

6    program but into the ultimate issues in this case, including "CARB testing" and "quality

7    controls."  (Mot. at 19:3-15.)  It is also burdensome, as Plaintiff insists documents must be

8    produced and interrogatories answered (Plaintiff does not say how many) in 15 days, and

9    witnesses identified in 10 days.

10             In the third place, this discovery is guaranteed to be redundant.  There are 99 cases and

11   hundreds of plaintiff's counsel registered in the MDL proceeding.  Do they all get to ask

12   questions at the depositions?  If not, they cannot be bound, and they will contend that they must

13   be allowed to redepose all these witnesses after the MDL issue gets decided.  That is unfair.  *See,*

14   *e.g.*, *Weaver v. Pfizer, Inc.*, No. 2:14-cv-0818 KJM KJN, 2014 WL 2002212, at *4 (E.D. Cal.

15   May 15, 2014) (granting stay because of burden on defendant of having to defend itself in

16   multiple fora and to relitigate any decisions the court makes before the case is transferred to the

17   MDL court); *Couture v. Hoffman-La Roche, Inc.*, No. C-12-2657 PJH, 2012 WL 3042994, at *3

18   (N.D. Cal. July 25, 2012) (granting motion to stay because the "[d]efendants face potential

19   hardship if their motion is denied because they risk having to litigate in multiple fora").

20   **IV.    CONCLUSION**

21             For the foregoing reasons, Lumber Liquidators respectfully requests that this Court deny

22   Plaintiff's motion in its entirety.

23   Dated:  April 22, 2015                    MORRISON & FOERSTER LLP

24                                              By:  /s/ *William L. Stern*
                                                     William L. Stern
25
                                               Attorneys for Defendants
26

27

28