1  WILLIAM L. STERN (CA SBN 96105)
   WStern@mofo.com
2  WILLIAM F. TARANTINO (CA SBN 215343)
   WTarantino@mofo.com
3  LISA A. WONGCHENKO (CA SBN 281782)
   LWongchenko@mofo.com
4  LAUREN WROBLEWSKI (CA SBN 291019)
   LWroblewski@mofo.com
5  MORRISON & FOERSTER LLP
   425 Market Street
6  San Francisco, California  94105
   Telephone:    415.268.7000
7  Facsimile:    415.268.7522

8  JULIE Y. PARK (CA SBN 259929)
   JuliePark@mofo.com
9  MORRISON & FOERSTER LLP
   12531 High Bluff Drive
10 San Diego, California  92130-2040
   Telephone:    858.720.5100
11 Facsimile:    858.720.5125

12 Attorneys for Defendants
   LUMBER LIQUIDATORS, INC.,
13 LUMBER LIQUIDATORS
   LEASING, LLC, LUMBER
14 LIQUIDATORS HOLDINGS, INC.,
   and LUMBER LIQUIDATORS
15 SERVICES, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| JAMES SILVERTHORN, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>LUMBER LIQUIDATORS, INC.; LUMBER LIQUIDATORS LEASING, LLC; LUMBER LIQUIDATORS HOLDING, INC.; and LUMBER LIQUIDATORS SERVICES, LLC.,<br><br>Defendants.<br><br>[caption continued on next page] | Case Nos. 15-cv-01428-JST,<br>15-cv-01475-JST<br><br>**DECLARATION OF JOHN F. MCCARTHY IN SUPPORT OF DEFENDANTS' OPPOSITIONS TO THE SILVERTHORN MOTION FOR PROTECTIVE ORDER AND EXPEDITED DISCOVERY AND THE WASHINGTON MOTION FOR PRELIMINARY INJUNCTION.**<br><br>Judge:    Hon. Jon S. Tigar |

| | |
|---|---|
| 1 | LILA WASHINGTON; LAURA WASHINGON; RYAN and KRISTIN BRANDT, husband and wife; KENNETH and CASANDRA BARRETT, husband and wife, on behalf of themselves and all others similarly situated, |
| 2 | |
| 3 | |
| 4 | |
| 5 | Plaintiffs, |
| 6 | v. |
| 7 | LUMBER LIQUIDATORS, INC., a Delaware corporation, |
| 8 | |
| 9 | Defendant. |

MCCARTHY DECL. ISO DEFS.' OPP'NS TO THE SILVERTHORN AND WASHINGTON MOTIONS
CASE NOS. 15-CV-01428-JST, 15-CV-01475-JST
sf-3528030

2

I, John F. McCarthy, declare as follows:

1.      I am President of Environmental Health & Engineering, Inc. ("EH&E"), with more than thirty years of experience in environmental exposure assessment. My particular focus has been on multimedia source characterization and assessment that could result in human exposure to contaminants in community, industrial and non-industrial settings. My work has involved the assessment and characterization of particles and gases, metals, and volatile organic compounds, among others, as it pertains to exposure to these contaminants. I have been employed by EH&E since January of 1988. Prior to that, I was employed as a research scientist by the Massachusetts Institute of Technology Energy Laboratory where I studied particulate and vapor production from various high temperature processes and evaluated health impacts of resulting airborne contaminants. My work has involved design and implementation of field and controlled chamber studies to determine the source, transport, and fate of various airborne contaminants, as well as evaluating their possible exposure potential and risk.

2.      I am certified by the American Board of Industrial Hygiene in Comprehensive Practice. I received my Master of Science degree in Environmental Health Sciences, specializing in Air Pollution Control and Industrial Hygiene, from Harvard University in 1978. I received my Doctor of Science degree in Environmental Science and Physiology, specializing in Physical Science and Engineering, from Harvard University in 1987. I have published numerous scientific papers on air quality analysis including exposure characterization in indoor environments, as well as served as the Program Director for a number of research projects for the U.S. Environmental Protection Agency's Indoor Environmental Quality Division and the National Institute of Occupational Safety and Health's Division of Respiratory Disease Studies. I have served on several private, governmental and professional organizations' health and safety committees. I was the Principal Investigator on the research studies related to problem drywall conducted by EH&E on behalf of the Consumer Product Safety Commission. My qualifications are further detailed in my *curriculum vitae*, which is attached hereto as Exhibit A.

3.      I have been asked to evaluate the general approach that Lumber Liquidators is taking in conducting a screening assessment of formaldehyde levels resulting from installed

MCCARTHY DECL. ISO DEFS.' OPP'NS TO THE SILVERTHORN AND WASHINGTON MOTIONS
CASE NOS. 15-CV-01428-JST, 15-CV-01475-JST
sf-3528030

1

products in homes. I have also been asked to give an opinion as to the potential risk to consumers of false-negative results in the event the screening process yields lower than actual formaldehyde concentrations in homes. In addition, I have been asked to evaluate various documentation having to do with the current Lumber Liquidators litigation including the Declaration of Ms. Elisabeth Black, CIH and reports prepared by Charles Yelvington.

4. My **conclusions** are as follows:

   a. The Lumber Liquidators formaldehyde screening program, as currently constituted, meets the quality criteria for the prime objective that it was intended for, which is to provide a meaningful and reproducible approach for determining which residences are likely to have elevated airborne formaldehyde levels and would require additional investigation and follow-up.

   b. The likelihood that the sampling program would present risk to consumers from false negatives is extremely low. If anything, due to the presence of other sources of formaldehyde gas in and around residences, it is more likely to produce false positives which would have the effect of requiring further investigation into the homes that are found to be above the level designated for further investigation.

   c. I have seen no compelling information presented in the documents that I have reviewed to date that would indicate that an imminent hazard is present in the homes that have the subject products installed.

In addition to the materials specifically cited above, I reviewed the materials listed in Exhibit B for my evaluation and in formulating my opinions.

**Evaluation of the Lumber Liquidators Testing Procedure**

5. Lumber Liquidators has established a multi-component screening program to assess the relative levels of formaldehyde that can be found in the air of homes where specific Lumber Liquidator products were purchased for installation. It is my understanding that the testing program was intended to serve as a screening program to determine if levels were higher than typical, expected levels regardless of the source of the formaldehyde and should be

MCCARTHY DECL. ISO DEFS.' OPP'NS TO THE SILVERTHORN AND WASHINGTON MOTIONS
CASE NOS. 15-CV-01428-JST, 15-CV-01475-JST
sf-3528030

2

followed up with further investigation. This testing program was not intended to provide a quantitative exposure assessment or necessarily determine the source of the gas in the home, at this time.

6. Lumber Liquidators utilized passive dosimeters, which is an established, well-validated procedure, as the preferred screening technique to assess formaldehyde levels in the subject homes. This approach, of providing passive dosimeters which are sent from a central laboratory to untrained lay people for deployment and collection using written instructions for guidance, has been utilized in multiple peer reviewed studies, with success, for decades to evaluate indoor environments. Sexton, et.al. (1986)[1] reported on a study undertaken by the Indoor Air Division of the California Department of Health Services to assess formaldehyde levels in residences through the use of diffusion samplers that were mailed to homeowners for sampling with written instructions and mailed back to a designated laboratory for analysis. Liu, et al., (1991)[2] reported on another study undertaken by the California Indoor Air Quality Division that measured formaldehyde in mobile homes that utilized a similar set of protocols for collecting data. The California Air Resources Board (CARB) utilized this type of approach in a survey they performed in 2001 where they measured formaldehyde in portable classrooms[3]. The protocol was implemented through the direct mailing of samplers with accompanying instructions to lay people (e.g., school administrators and teachers) and not professionals trained in the collection of environmental samples. Canada (2012)[4] utilized this approach in looking at 18,000 homes in their cross-Canada survey of radon concentrations in homes. Varns, et al. (2002)[5] described how the regional networking of monitoring sites in the Dallas area was successfully operated utilizing passive dosimeters that were mailed to participants. The US

---

[1] Sexton K, et al. 1986. Formaldehyde Concentrations inside Private Residences: A Mail-Out Approach to Indoor Air Monitoring, *Journal of the Air Pollution Control Association*, 36:6, 698-704.
[2] Liu K, et al. 1991. Irritant Effects of Formaldehyde Exposure in Mobile Homes, *Environmental Health Perspectives*, Vol. 94, 91-94.
[3] California Air Resources Board. 2004. Environmental Health Conditions in California's Portable Classrooms. Report to the California Legislature.
[4] Health Canada. 2012. Cross-Canada Survey of Radon Concentrations in Homes, Final Report. Minister of Health: Ottawa, Ontario.
[5] Varns JL, et al. 2001. Passive Ozone Network of Dallas: A modeling opportunity with community involvement. 1. *Environmental Science and Technology,* 35:845-855.

MCCARTHY DECL. ISO DEFS.' OPP'NS TO THE SILVERTHORN AND WASHINGTON MOTIONS
CASE NOS. 15-CV-01428-JST, 15-CV-01475-JST
sf-3528030

3

EPA's National Health and Environmental Effects Research Laboratory used passive samplers mailed to untrained lay people to evaluate indoor and outdoor VOC, NO2 and polycyclic aromatic hydrocarbons (PAHs) levels at homes in the Detroit area (Johnson et al., 2009)[6]. The broad utilization of this type of this technique shows that the basic approach to air quality monitoring of mailing validated passive dosimeters to lay subjects with simple instructions is sound and reliable. Furthermore, both the Consumer Product Safety Commission and the California Air Resources Board recommend the use of home test kits in assessing formaldehyde levels thought to be associated with composite wood products in indoor air (CPSC, 2013 publication 725 guidance[7]; California Environmental Protection Agency 2015 guidance document[8]).

7. The CPSC 2013 Publication 725 provides specific guidance that the consumer should consider to feel comfortable that valid samples are being collected. I believe that those guidelines are appropriate to review here in light of discussions surrounding the applicability of this process for the Lumber Liquidators screening program. They are as follows:

Is the test based on a known method for assessing formaldehyde in air (i.e., NIOSH 3500)?

– Yes, the test used in this program is based on NIOSH Method 2016 that is a well validated method and has been modified for use with diffusion samplers.

Has the test been validated by a reputable laboratory?

– Yes, the laboratories that are performing these analyses are accredited by the Industrial Hygiene Laboratory Accreditation Program (IHLAP) of the American Industrial Hygiene Association's Laboratory Accreditation Program, LLC (AIHA-LAP, LLC).

Does the test have a low detection limit ($\leq$ 20 - 30 ppb)?

– Yes, the limit of detection (LOD) has been reported to be 0.003 ppm.[9]

---

[6] Johnson M, et al. 2009. A participant-based approach to indoor/outdoor air monitoring in community health studies. Journal of Exposure Science and Environmental Epidemiology. 19:492-501.
[7] CPSC. 2013. An Update on Formaldehyde. Publication 725, 2013 Revision. Consumer Product Safety Commission.
[8] California Environmental Protection Agency Air Resources Board. 2015. Facts about Flooring Made with Composite Wood Products.
[9] Advanced Chemical Sensors, Inc. Formaldehyde Vapor Monitor, Technical Information Sheet.

MCCARTHY DECL. ISO DEFS.' OPP'NS TO THE SILVERTHORN AND WASHINGTON MOTIONS
CASE NOS. 15-CV-01428-JST, 15-CV-01475-JST
sf-3528030

4

Does the test have good accuracy (± 20%)?

– Yes, the accuracy is acceptable.[10]

Does the test have minimal interference from other chemicals, such as VOCs or ozone?

– Yes, there are no significant interferences expected for this test.[11]

Does the test have very specific instructions on where to place the sampler and for how long?

– Yes, the instructions that accompany the test are specific on this count.[12]

Does the test include a detailed report with potential recommendations?

– No, this test program was not designed to be a standalone home test for the general consumer but rather a screening level evaluation with follow-up being provided through Lumber Liquidators. Therefore, potential recommendations would not be appropriate to be included in the report.

Does the test include technical support?

– Yes, there is contact information available on the instruction sheet to assist with the implementation of the test.

### **The Potential for This Testing Protocol to Provide False Negatives**

8.   This protocol is designed to collect total airborne formaldehyde levels found in the indoor environment of the room being tested. As such it will measure formaldehyde in air that can come from multiple other sources within the home environment such as cooking, smoking, furniture, cabinetry, drapery and the outdoors. Because the airborne formaldehyde sampled is not specific to just the flooring, there is a high probability that sample results will overestimate the concentration of formaldehyde that is in the room where the test is being taken that could be potentially attributed to the subject flooring. Although this could be considered a "false positive" or an overestimation of formaldehyde in the air attributable to flooring, it is a conservative error since it will bias the results positive (i.e., in a more elevated direction) and

---

[10] Advanced Chemical Sensors, Inc. Previously cited.
[11] Advanced Chemical Sensors, Inc. Previously cited.
[12] ED Lab. Indoor Air Quality Screening Kit - Formaldehyde Instructions.

MCCARTHY DECL. ISO DEFS.' OPP'NS TO THE SILVERTHORN AND WASHINGTON MOTIONS
CASE NOS. 15-CV-01428-JST, 15-CV-01475-JST
sf-3528030

5

cause additional investigation to identify potential sources to be undertaken in more cases than may be warranted by just the presence of formaldehyde attributed to the flooring.

9. Due to the fact that the sample is being collected over a 24 hour period it is more likely that samples collected during that time period would represent a more extreme measurement period when compared to longer time periods of measurement. A positive bias is more likely to occur in this program because it is assessing a self selected population that is highly motivated to collect accurate sampling results and will likely minimize increasing ventilation rates and reduce travel into and out of the room. Limiting increases in ventilation and access to a room over a 24 hour period is far easier than over a longer time period. This will serve to bias the results higher.

### Evaluation of the Declaration of Elisabeth Black

10. Ms. Black utilizes vague and imprecise statements in describing health hazards associated with exposure to formaldehyde. Because of the large number of erroneous and misleading statements in her declaration, I will address them individually in the following paragraphs. In paragraph four of her declaration[13], Ms. Black misattributes a lower exposure level, specifically 0.1 parts per million (ppm), for causing a number of adverse health impacts such as "respiratory irritation, headaches, coughing, dizziness, and nausea." She further states that "eyes are especially sensitive to formaldehyde and will burn even at low levels of exposure." She attributes the statements to a peer reviewed article by Golden (2011)[14]. Upon review of Golden's article, he clearly stated that the irritated eye symptoms that Ms. Black details in her declaration will not happen at levels below 0.24 - 0.5 ppm. Furthermore, based on his detailed toxicological review, Golden actually recommends a standard of acceptability for indoor air exposure of 0.1 ppm for formaldehyde since no adverse health effects had been noted below that level. This position is further supported by the World Health Organization (WHO) document that states, "For the indoor environment (24 hours), a value of 0.125 mg/m$^3$ (0.10 ppm) was

---

[13] Declaration of Elisabeth Black, C.I.H. Case No. 15-cv-01475-JST, filed April 8, 2015.
[14] Golden R. 2011. Identifying an indoor air exposure limit for formaldehyde considering both irritation and cancer hazards. *Critical Reviews in Toxicology,* Vol. 41, No. 8, Pages 672-721.

McCARTHY DECL. ISO DEFS.' OPP'NS TO THE SILVERTHORN AND WASHINGTON MOTIONS
CASE NOS. 15-CV-01428-JST, 15-CV-01475-JST
sf-3528030

6

considered safe for the entire population against sensory irritation, including chronic sensory irritation."[15] As discussed above, Lumber Liquidators utilized a well-documented and scientifically valid testing procedure employing passive dosimeters to provide a screening level review for formaldehyde levels in homes that had installed the subject flooring. Ms. Black (in her paragraph 11) discusses what she considers to constitute a valid and reliable testing procedure. Reviewing the procedures being employed in the Lumber Liquidators testing program, and the fact that the analysis is being performed by AIHA–LAP, LLC certified laboratories, I feel the method employed is valid and, absent significant sampling or user error, will effectively measure the level of formaldehyde in a home as intended. Furthermore, the Consumer Product Safety Commission (CPSC) in their 2013 guidance[16] gives specific criteria for determining whether an in-home formaldehyde test is reputable or not (see Paragraph 7 above). Reviewing the Lumber Liquidators approach and the laboratories that they are employing, the in-home tests meet all the criteria recommended by the CPSC.

11.   Ms. Black continually misinterprets the overall goal of the Lumber Liquidators program, which is to serve as a broad-based screening tool to identify homes with elevated formaldehyde levels and to determine whether additional follow-up or remedial measures is warranted. Ms. Black, in her paragraph 12, states that she does not believe that a user will be able to collect a valid and useful sample using the "oversimplified test protocol". I disagree. As noted above, the same approaches utilized in the Lumber Liquidators protocol have been routinely used in scientific studies that have been peer reviewed and published in the scientific literature. Furthermore, the intent of this program is to screen the homes to make a determination as to the need for additional follow-up.

12.   In Ms. Black's paragraph 13 she talks about the procedures to be used and the fact that a qualified professional should be employed to, "design a sampling strategy and to collect sample data… ." These really are two very different points and need to be effectively

---

[15] WHO. 2010. WHO Guidelines for Indoor Air Quality, Selected Pollutants. Copenhagen, Denmark: World Health Organization.
[16] CPSC. 2013. Previously cited.

MCCARTHY DECL. ISO DEFS.' OPP'NS TO THE SILVERTHORN AND WASHINGTON MOTIONS
CASE NOS. 15-CV-01428-JST, 15-CV-01475-JST
sf-3528030

7

separated to be properly evaluated. First, the design of the Lumber Liquidators' sampling strategy has been overseen by a professional. Secondly, the approach that is being taken will collect accurate and reliable data for the stated intent of screening consumers' homes that will allow an informed interpretation as to the need for additional follow-up. The sole intent of this sampling program was to serve as screening tool to determine the need for additional follow-up investigation or remedial measures.

13. There is no need for a "custom program" to be designed for each and every residence at this time to accomplish the goals of this program as Ms. Black states in her paragraph 13.

14. In Ms. Black's paragraph 14, where she discusses the factors to include in designing a valid air sampling program, she states a number of points that are irrelevant based on the stated intent of this sampling program as it is being used as a screening tool, not as a health risk assessment tool. Specifically:

   i. Number – Sampling in a single room that has the subject flooring product present, for the purpose of this screening evaluation, is perfectly appropriate. Lumber Liquidators provided multiple sampling badges for consumers who wanted to test multiple rooms or had large surface areas of flooring installed.

   ii. Location of the sample – Placement of the sampler is of course predicated upon what the professional wanted to accomplish with the sampling. For this screening effort, the priority is to avoid placement of the badge in areas that would impair the reliability of the reading (i.e., keep away from an open window). In this type of screening program it is not feasible, practical or appropriate to make adjustments for infants, toddlers, or pets. Users are given specific instructions to ensure placement that will support the collection of reliable results..

   iii. Duration – Ms. Black is incorrect in recommending that a professional would sample "only when the space is occupied or when it is occupied by a sensitive individual or only when the ventilation is in use." Maintaining uniformity

MCCARTHY DECL. ISO DEFS.' OPP'NS TO THE SILVERTHORN AND WASHINGTON MOTIONS
CASE NOS. 15-CV-01428-JST, 15-CV-01475-JST
sf-3528030

8

throughout the entire sampling program as currently designed is desirable in order to make meaningful comparisons. As has been seen in the scientific studies referenced in paragraph 6 above, many studies have utilized uninterrupted 24 hour sampling periods to collect meaningful formaldehyde concentration measurements in homes.

    iv. Volume – The issue regarding room volume is of secondary importance in this study protocol. The surface area of flooring to room volume found in typical current homes does not vary significantly.

    v. Ventilation – The current program allows residents to live as they typically do utilizing ventilation as necessary. This is fully consistent with the approach that was taken in the California Air Resources Board November 2009 study "Ventilation and Indoor Air Quality in New Homes"[17] where they had people live normally during the ongoing tests. This type of program will not result in underreporting of the readings of "actual formaldehyde levels" but rather provide meaningful information with respect to the actual levels being found in homes under typical occupancy;

    vi. Barometric pressure – Has an insignificant impact on sample results in the context of the intent of this screening program.

    vii. Temperature and humidity – In assessing the relative impact of formaldehyde concentrations in homes we are interested in typical home temperatures at this time and are not trying to do this under elevated temperatures.

    viii. Personal habits – The description of personal habits that Ms. Black is concerned about has to do with combustion activities, pet products, and other building materials that could contain formaldehyde. This is not a problematic issue during the screening program because these potential confounders will bias the results high and create false positives if other sources are present. It is

---

[17] California Environmental Protection Agency Air Resources Board. 2009. Ventilation and Indoor Air Quality in New Homes. California Energy Commission PIER Collaborative Report, CEC-500-2009-085.

MCCARTHY DECL. ISO DEFS.' OPP'NS TO THE SILVERTHORN AND WASHINGTON MOTIONS
CASE NOS. 15-CV-01428-JST, 15-CV-01475-JST
sf-3528030

9

      my understanding that this type of result would place the subject residence into a follow-on review program where a survey questionnaire will be administered to the residents and the results will be utilized to further diagnose the need for specific interventions.

  ix. Sensitive populations – The presence of potentially sensitive populations does not have an impact on the sampling strategy employed in this screening assessment. Decisions regarding follow-up and the need for intervention are being based on relative differences found in the measurements that are based on health protective guidelines.

15. In Ms. Black's paragraph 15, where she discusses, "implementing a sampling strategy to measure indoor formaldehyde concentrations," she has selectively, and mistakenly, extracted a sentence from a CARB document on composite wood products when she quotes: "It is possible to have flooring properly tested for formaldehyde emissions, but these tests are difficult and expensive."

16. She is apparently attributing that statement to the general air quality monitoring being proposed while in fact the sentence she quotes is specifically related to the CARB test chamber protocol. In fact, the opening sentence of the same paragraph from the CARB document from which she extracted the sentence quoted above specifically states that, "A homeowner can use home indoor air test kits to test the indoor air formaldehyde concentrations."[18] Ms. Black's misstatement of the CARB guidance found in the document is completely in opposition to the intent that she is presenting in her declaration.

17. In discussing the "potential consequences of using do-it-yourself testing kits," Ms. Black, in paragraph 16, makes several unfounded and invalid points. She states that the test kits "will not likely be valid because the air sampling failed to account for existing conditions." However she provides no basis for that assertion. As shown in the Air Resources Board's

---

[18] California Environmental Protection Agency Air Resources Board. Reducing Formaldehyde Emissions from Composite Wood Products.

MCCARTHY DECL. ISO DEFS.' OPP'NS TO THE SILVERTHORN AND WASHINGTON MOTIONS
CASE NOS. 15-CV-01428-JST, 15-CV-01475-JST
sf-3528030

10

November 2009 report, "Ventilation and Indoor Air Quality in New Homes"[19], their investigators utilized passive badges and existing conditions in the homes that were being tested to collect screening level data. She further states that using "invalid and unreliable sampling strategy will likely provide a false negative." Again, there is no basis for her assertion that the method being employed in the Lumber Liquidators program is based on an invalid and unreliable sampling strategy. Furthermore, she gives no rationale for why she believes that this would provide "false negative" testing results. Because of the multiple sources of formaldehyde that can exist within a home, it is more likely than not that this test procedure will be biased high due to other potential sources and measure elevated levels of formaldehyde in the home and therefore be conservative by detecting "false positives" that would be further evaluated.

18. In paragraph 17 Ms. Black suggests that the homeowner should be provided with "a remediation plan to immediately mitigate formaldehyde exposures." She provides recommendations, but does not focus on a relevant recommendation that was made by the CPSC in their 2013 guidance document, Publication 725[20], as well as the information provided by the Air Resources Board in their Frequently Asked Questions for Consumers on composite wood products[21] where they both recommend increasing ventilation by opening up windows, bringing fresh air in through a central ventilation system, and running exhaust fans to help expedite formaldehyde off gassing of finished goods.

19. In paragraph 19 Ms. Black questions whether the Lumber Liquidators program is an independent assessment of formaldehyde exposures in the subject homes. The program as designed is intended to inform Lumber Liquidators' decision making as to the need for appropriate follow-up, including additional investigation or remediation. As has been described in previous sections of this declaration, the sample collection and analysis methodology that is being employed is valid and appropriate and the laboratories being utilized are accredited to

---

[19] California Environmental Protection Agency Air Resources Board. 2009. Previously cited.
[20] CPSC. 2013. Previously cited.
[21] California Environmental Protection Agency Air Resources Board. Facts about Flooring Made with Composite Wood Products.

perform the analyses. It is my understanding that Lumber Liquidators has been in contact with the CPSC and has reviewed the program, literature and values being used to guide decision making with their Office of Compliance. [Declaration of William Tarantino][22]. I believe that this level of continued communication and knowledgeable review by an independent government agency provides assurance that appropriate interpretations of results will be made in this screening program.

20.   In reviewing Ms. Black's CV, I do not see any mention of her experience in performing, directing or even utilizing small or large chamber testing protocols that are consistent with CARB-2 protocols as have been reported by Benchmark International or HPVA Laboratories in their assessment of the flooring samples. I question how Ms. Black, without that type of experience and no other stated qualifications of relevant training or education is qualified to review the cited documentation and reports, effectively endorse those sample results and be confident that the laboratories followed ASTM D-6007, with respect to sample preconditioning, sample preparation, loading ratio and myriad other key technical factors except by the laboratories' assertions.

**Evaluation of the test results of Charles Yelvington**

21.   I reviewed two reports prepared by Charles Yelvington NWFA. Both had an inspection date of "Mar 05, 2015", both had a report date of "3/6/15", both had the same invoice number "50008" and both had the same typographical errors throughout the body of the report. The only differences were the name of the individual that commissioned the report, the product description and the "reading" that was provided in the body of the report[23].

22.   There is insufficient information present to interpret either of these reports or the associated "reading" and neither qualify as a reasonable or valid approach to qualifying the potential for hazard within the residences they purport to assess, for the following reasons:

---

[22] Declaration of William F.Tarantino, Case Nos. 15-cv-01428-JST, 15-cv-01475-JST.
[23] Charles Yelvington NWFA Inspection Report - laminate flooring, March 6, 2015.

MCCARTHY DECL. ISO DEFS.' OPP'NS TO THE SILVERTHORN AND WASHINGTON MOTIONS
CASE NOS. 15-CV-01428-JST, 15-CV-01475-JST
sf-3528030

12

      a. There is no information presented as to what type of instrument or equipment was used to collect the sample.

      b. There is no information presented as to whether the instrument or method is a validated procedure or whether there are potential interferences that should be accounted for.

      c. There is no information as to what range setting the instrument was set on (if it was a direct reading instrument) and with no units presented for the reading in the report we cannot interpret the result.

      d. There is no information as to where the samples were collected with respect to the flooring it purports to measure.

This information would be required to assess whether the instrument or method (if we knew the instrument or method employed) was being used in a manner that was consistent with its recommended operating parameters.

      23. Mr. Yelvington presents a series of values near the bottom of each of his reports that he purports are OSHA standards. The values he presents are not consistent with those presented in 29-CFR 1910.1048, the Formaldehyde Standard[24], where the acceptable levels are prescribed. I am at a loss as to where Mr. Yelvington obtained these values from and how he could have thought they represented OSHA acceptable limits. The current OSHA Guidelines are 0.750 ppm for an 8 hour Permissible Exposure Limit, 0.50 ppm for an 8 hour Action Level and 2.000 ppm for a 15 minute Short Term Exposure Limit.

---

[24] OSHA 29CFR1910. Occupational Safety and Health Standards. *Code of Federal Regulations.* Title 29, Part 1910.1048. Washington, DC: U. S. Occupational Safety and Health Administration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 22, 2015, in Needham, Massachusetts.

By: /s/ John F. McCarthy
John F. McCarthy

MCCARTHY DECL. ISO DEFS.' OPP'NS TO THE SILVERTHORN AND WASHINGTON MOTIONS
CASE NOS. 15-CV-01428-JST, 15-CV-01475-JST
sf-3528030

14