WILLIAM L. STERN (CA SBN 96105)
WStern@mofo.com
WILLIAM F. TARANTINO (CA SBN 215343)
WTarantino@mofo.com
LISA A. WONGCHENKO (CA SBN 281782)
LWongchenko@mofo.com
LAUREN WROBLEWSKI (CA SBN 291019)
LWroblewski@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105-2482
Telephone: 415.268.7000
Facsimile: 415.268.7522

JULIE Y. PARK (CA SBN 259929)
JuliePark@mofo.com
MORRISON & FOERSTER LLP
12531 High Bluff Drive
San Diego, CA  92130-2040
Telephone: 858.720.5100
Facsimile: 858.720.5125

Attorneys for Defendants
LUMBER LIQUIDATORS, INC.,
LUMBER LIQUIDATORS LEASING, LLC,
LUMBER LIQUIDATORS HOLDINGS, INC.,
and LUMBER LIQUIDATORS SERVICES, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| JAMES SILVERTHORN, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>LUMBER LIQUIDATORS, INC.; LUMBER LIQUIDATORS LEASING, LLC; LUMBER LIQUIDATORS HOLDINGS, INC.; and LUMBER LIQUIDATORS SERVICES, LLC.,<br><br>Defendants. | Case No. CV15-01428-JST<br><br>**DEFENDANTS' SUR-REPLY IN OPPOSITION TO PLAINTIFF'S MOTION FOR PROTECTIVE ORDER AND FOR EXPEDITED DISCOVERY**<br><br>Hearing Date:   May 14, 2015<br>Time:               2:00 p.m.<br>Judge:             Hon. Jon S. Tigar<br><br>Complaint filed:  April 3, 2015 |

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ......................................................................................................I

I. INTRODUCTION ................................................................................................ 1

II. ADDITIONAL FACTS OFFERED IN SUR-REPLY........................................ 1

 A. Additional Facts Concerning the Consumer Product Safety Commission. ............ 1

 B. Additional Facts from Dr. McCarthy. .................................................................... 2

 C. Additional Facts Concerning Plaintiff's Two Declarants. ..................................... 4

  1. Patty Cottington Obtained a Test Report from EDLab That Was Within the WHO Guidance. .......................................................................... 4

  2. Madeline Green Never Complained to Lumber Liquidators about Formaldehyde, and Never Requested an Indoor Air Kit......................... 4

 D. Additional Facts Concerning the Testing Program. ................................................ 5

III. ARGUMENT IN SUR-REPLY. ......................................................................... 6

 A. Plaintiff's Arbitration Allegation Is a Non-Issue. .................................................. 6

 B. Plaintiff Has Adduced No Facts Warranting Court Supervision Over Defendants' Communications With Concerned Customers. .................................... 7

 C. There Is No Evidence That Defendants' Communications Seek to Interfere With the Putative Class Action. .............................................................................. 8

IV. CONCLUSION .................................................................................................... 9

## I.     INTRODUCTION

In its initial opposition, Lumber Liquidators showed that arbitration is a non-issue; that the Consumer Product Safety Commission ("CPSC") disagrees with Plaintiff about his major premise, i.e., that deconstructive testing or CARB-compliance is an appropriate measure for assessing public safety; that the free, "no strings attached" indoor air testing program does not mention litigation or result in a waiver of anyone's rights or cause changes in anyone's legal position; how the letters and communications about that program are truthful, non-coercive, and do not impinge on anyone's right to participate in a class action; that Mr. Silverthorn never requested a test kit and therefore lacks standing to complain; and that the First Amendment prohibits a class action claimant from forcing a defendant to carry its partisan litigation message.

Plaintiff's Reply[1] has shown why this motion should be denied.  Plaintiff fails to address most of this.  Instead, he changes direction.  Now, he says, Defendants' crime is having aimed their messages at putative class members; using a third-party lab that is not itself certified for formaldehyde testing, even though the four partner labs that conduct the testing *are* certified; "browbeat[ing]" customers about what is "proper testing"; and not admitting in the customer communications that its laminate flooring is not CARB-compliant.  All of this is wrong.

For all the foregoing reasons, this Court should deny Plaintiff's motion.

## II.     ADDITIONAL FACTS OFFERED IN SUR-REPLY

### A.     Additional Facts Concerning the Consumer Product Safety Commission.

As explained in Defendants' opposition, the CPSC is currently investigating Lumber Liquidators' Chinese laminated flooring.  Not only has it rejected deconstructive testing as a measure of safety, but it is also aware of Lumber Liquidators' testing program and has been reviewing the results.  (Opp. 5:23-6:9, 9:21-10:3.)

William F. Tarantino, counsel for Lumber Liquidators, has been in frequent contact with CPSC staff, and the staff has assured him that if they had objections, they would advise him and

---

[1] Plaintiff's Reply in Support of Emergency Motion for Protective Order and Expedited Discovery ("Reply"), Dkt. No.  42.

1   Lumber Liquidators.  At no point did the CPSC staff indicate that the use of the passive badge

2   indoor air monitors method was improper.  Lumber Liquidators has incorporated every comment

3   from the CPSC into the proposed communications.  (Sur-Reply Declaration of William F.

4   Tarantino in Support of Defendants' Oppositions to the Silverthorn Motion for Protective Order

5   and Expedited Discovery and the Washington Motion for Preliminary Injunction ("Tarantino II.

6   Decl.") ¶¶ 4-5.)  In the course of these communications, the CPSC also requested that Lumber

7   Liquidators provide details of the results of the testing program, as well as any data collected

8   from consumers that would be relevant to potential formaldehyde exposure, and Lumber

9   Liquidators is cooperating with that request.  (*Id.* ¶ 6.)

10       On May 7, 2015, Mr. Tarantino spoke with CPSC Deputy Director for the Office of

11   Compliance and Field Operations, Marc Schoem, who has been directly involved in the

12   investigation since its inception.  Mr. Schoem confirmed that the CPSC had reviewed the indoor

13   air screening program and that the complete data set generated by the indoor air quality program

14   is a relevant factor for the CPSC staff's investigation and ultimate determination of whether or

15   not these products pose a substantial product hazard.  He reiterated that the Commission's staff

16   would consider the indoor air quality testing in the context of all other available information.  Mr.

17   Schoem also stated that, as of May 7, 2015, CPSC staff had not determined that any hazard exists

18   that warrants further action from Lumber Liquidators.  (*Id.* ¶ 7.)

19       **B.    Additional Facts from Dr. McCarthy.**

20       In Defendants' initial opposition, Dr. McCarthy explained that Plaintiff misunderstands

21   the goal of this program, which is to serve as a broad-based initial screening tool to identify

22   homes with elevated formaldehyde levels and, from that, to determine whether additional follow-

23   up or remedial measures are warranted; that it is *not* a test for CARB compliance; and that the

24   risk of false negatives is "extremely low" and more likely to result in false positives.  (McCarthy I

25   Decl. ¶ 17.)  In his Sur-Reply Declaration, Dr. McCarthy goes further[2]:

26

27

28       [2] The points below respond to both the *Washington* and *Silverthorn* Plaintiffs' criticisms.

- **The WHO guidelines.** The WHO guidelines[3] derive a "no observed adverse effect level" ("NOAEL") for sensory irritation[4] based on human subjects demonstrating "conjunctival redness and increased eye blink frequency...." (McCarthy II Decl. ¶¶ 3-4.) This was found to be 0.63 mg/m³ (0.5 ppm). WHO then incorporated an additional margin of safety by dividing the NOAEL by a factor of 5 and further rounding it down to 0.10 mg/m³. This converts to 0.08 ppm. (*Id.* ¶ 4.)

- **The decision to use 0.081 ppm for escalation.** Lumber Liquidators' decision to escalate cases of readings at or above 0.081 ppm is derived from this WHO review of the scientific literature, which concluded that inhalation exposures to concentrations less than 0.081 ppm (0.1 mg/m³) for a duration of 30 minutes are unlikely to yield "sensory irritation." (*Id.* ¶ 17.)

- **The draft EPA Report.** The draft EPA Report on which Lumber Liquidators relies incorporates the Salthammer findings, which identify concentrations up to 0.1 mg/m3 as "normal" levels in a "typical home" in the U.S. That draft EPA report is reliable. It cites a peer-reviewed scientific publication, and the National Research Council ("NRC") of the National Academy of Sciences reviewed that draft EPA Report and chose to reproduce in its report the same information on normal levels of formaldehyde in indoor air. *See* Nat'l Academies Press, *Review of the Environmental Protection Agency's Draft IRIS Assessment of Formaldehyde* (2011), *available at* http://www.nap.edu/catalog/13142/review-of-the-environmental-protection-agencys-draft-iris-assessment-of-formaldehyde.

- **The ATSDR guideline is inapplicable.** Likewise, Plaintiffs' criticism that Lumber Liquidators should have used a guideline recommended by the U.S. Agency for Toxic Substances and Disease Registry ("ATSDR") is also unfounded. The ATSDR explicitly states that this standard is to apply to hazardous waste sites, an exposure scenario that is quite different from a residence. (McCarthy II Decl. ¶ 23.)

- **The NIOSH guideline is inapplicable.** Plaintiffs' criticism that Lumber Liquidators should have used a guideline value for formaldehyde recommended by the U.S. National Institute of Occupational Safety and Health ("NIOSH") is unfounded. The NIOSH guideline value is applicable to workplace environments. (*Id.* ¶ 22.)

- **The data collection methodology is sound.** As for the claim that this is "do it yourself" and can only be done by trained professionals, that is also unfounded. The CARB study used a resident-deployed passive dosimeter administered by lay persons. (McCarthy I Decl. ¶ 6.)

- **Plaintiffs' threshold of 7 ppb.** Plaintiffs suggest that "elevated levels of formaldehyde" must be defined by concentrations greater than the California Office of Environmental Health Hazard Assessment ("CA OEHHA") value for chronic exposure, which is currently 7 ppb. (Jacobs

---

[3] WHO. 2010. WHO Guidelines for Indoor Air Quality, Selected Pollutants. Copenhagen, Denmark: World Health Organization.

[4] Defined by WHO as "an unpleasant sensation from the eyes and airways caused by stimulation of the trigeminal nerve endings by sensory irritants." (*Id.* ¶ 4 (citation omitted).)

1    Decl. ¶ 11.)  But that would mean nearly all residential buildings in the
2    U.S. would fail.  (McCarthy II Decl. ¶ 27.)

3    Dr. McCarthy also addresses the bona fides of the collection protocol, and does so both in

4    his first and his second declarations.  (McCarthy I Decl. ¶¶ 14, 17; McCarthy II Decl. ¶¶ 25-26.)

5    **C.**    **Additional Facts Concerning Plaintiff's Two Declarants.**

6    **1.**    **Patty Cottington Obtained a Test Report from EDLab That Was
7    Within the WHO Guidance.**

8    Patty Cottington requested a test kit from Lumber Liquidators.  The formaldehyde reading

9    was 0.010 ppm.  (Sur-Reply Declaration of Brian Pullin in Support of Defendants' Oppositions to

10   the Silverthorn Motion for Protective Order and Expedited Discovery and the Washington Motion

11   for Preliminary Injunction  ("Pullin III Decl.") ¶ 5.)  This falls below the WHO guideline and

12   well within the range of normal indoor air.  Hence, Lumber Liquidators' letters to Ms. Cottington

13   are truthful.

14   **2.**    **Madeline Green Never Complained to Lumber Liquidators about
15   Formaldehyde, and Never Requested an Indoor Air Kit.**

16   Ms. Green had discussions with both Lumber Liquidators and the installer's representative

17   about "problems with the *quality* of the flooring."  (Declaration of Madeline Green in Support of

18   Motion for Protective Order and for Expedited Discovery ("Green Decl.") ¶ 3 (emphasis added).)

19   Indeed, Ms. Green presented a *warranty* claim to Lumber Liquidators.  But she never made a

20   *formaldehyde*-related complaint to Lumber Liquidators.  (Declaration of Brian Pullin in

21   Opposition to Plaintiffs' Motion for Limited Expedited Discovery ("Pullin II Decl.") ¶ 10,

22   *Washington* Dkt. No. 40-1.)

23   She had a "very slight curling" problem, according to a third-party inspection report,

24   which the inspector concluded was not a manufacturing issue but an "adhesion" problem and,

25   hence, was an installation issue not covered by the warranty.  Lumber Liquidators denied her

26   claim on that basis.  (*Id*. ¶¶ 14-15; Exs. B, C.)  Ms. Green continued to press her adhesion

27   complaint as a manufacturing defect, and said she would get her own flooring inspection report.

28   Lumber Liquidators gave Ms. Green the names of two other flooring inspectors, but never

1  received a contrary report from Ms. Green.  (*Id.* ¶ 16.)  Nevertheless, Lumber Liquidators offered

2  her an accommodation: a store credit in the amount of $119.95, which was the value of three

3  boxes of the flooring she had purchased, which would be adequate to replace the planks that,

4  according to the Report, she had identified as problematic.  (*Id.* Ex. D.)

5      That letter contains a release, but it is a limited one.  By its terms, it does not cover

6  formaldehyde claims.  That is because, as noted above, Ms. Green never lodged a formaldehyde

7  complaint with Lumber Liquidators.  (*Id.* ¶ 10.)[5]  Moreover, the release is by its terms limited to

8  Ms. Green's "concerns of adhesion."  (Green Decl. Ex. C.)  Lumber Liquidators has no record of

9  Ms. Green ever requesting a free indoor air test kit from Lumber Liquidators.  (*Id.* ¶ 20.)  That

10  said, she could order one today.

11      **D.**      **Additional Facts Concerning the Testing Program.**

12      On May 7, 2015, Lumber Liquidators announced the preliminary results of its indoor air

13  testing program based on tests done on approximately 2,600 households.  Over 97% of

14  households had readings below the 0.081 guideline set by the WHO—in other words, the same

15  range as the homes of all four of Plaintiffs' declarants:

16          From early March through May 1, 2015, BHC [Building Health
         Check, LLC, which Lumber Liquidators retained to coordinate the
17          home air testing program] sent approximately 26,000 testing kits to
         nearly 15,000 Lumber Liquidators customers and approximately
18          11,000 of those testing kits were returned.  As of May 1, 2015, over
         3,400 testing kits from approximately 2,600 households with
19          laminate flooring sourced from China had been reviewed and
         analyzed.  Of those households, over 97% had indicated indoor air

20  ───────────────────

21      [5] Ms. Green is confused.  She states in paragraph 5 of her declaration that she sent written
    communication regarding formaldehyde concerns to a "Lumber Liquidators customer care
22  representative named 'Elyssa.'"  But Elyssa Howard is not a Lumber Liquidators employee.  She
    works for The Home Service Store, Inc. ("HSS"), the installer's representative.  That she works
23  for HSS and not Lumber Liquidators is clear from the emails, attached as Exhibit B to Ms.
    Green's declaration.  As it was, the only complaint of which Lumber Liquidators has a record of
24  processing was her complaint about "curling."  Had she requested a free indoor air test, her claim
    would have been subject to a very different resolution process.  (Pullin II Decl. ¶ 20.)

25      In response to Mr. Pullin's testimony that Ms. Green made only one mention of
    formaldehyde when speaking with Lumber Liquidators representatives, Ms. Green has filed a
26  "supplemental" declaration in which she now recalls speaking to other Lumber Liquidators
    representatives about formaldehyde.  (Dkt No. 49.)  Defendants have filed a motion to strike this
27  untimely declaration, (Dkt. No. 52), and, in any event, the release is clearly limited to adhesion
    issues.

28

1  concentrations of formaldehyde that were within the guidelines set
2  by the World Health Organization as protective against sensory
   irritation and long-term health effects.

3  *See* http://investors.lumberliquidators.com/2015-05-07-Lumber-Liquidators-Provides-Update-On-

4  Laminate-Flooring-Sourced-From-China (last visited May 7, 2015).[6]

5  **III.    ARGUMENT IN SUR-REPLY.**

6      **A.    Plaintiff's Arbitration Allegation Is a Non-Issue.**

7          In its initial opposition, (Opp. 10-12), Lumber Liquidators showed that it has

8  unequivocally and unambiguously waived the online arbitration clause, that its emailed assurance

9  to counsel and its repeat of that assurance in its opposition papers are more than enough to put the

10  issue to rest.  Plaintiff does not deny any of this, but insists that the Court enter an order to that

11  effect anyway.  (Reply 14:7-13.)

12          The order that class counsel requests is both unnecessary and insulting.  He is asking the

13  Court to order "Mr. Stern [to] instruct Defendants to circulate this Order to all counsel

14  representing any Defendant in all Related Cases, and shall bring this Order to the attention of any

15  transferee judge assigned in MDL 2627 and file a copy in the master docket of that proceeding."

16  (Declaration of Andrew J. McGuinness in Support of Plaintiff's Emergency Motion for Protective

17  Order and Expedited Discovery, Dkt. No. 19-1 at p. 99 of 100.)

18          Class counsel does not need an order to accomplish waiver.  Class counsel may desire an

19  order for other reasons, largely tactical, either to position themselves for Lead Counsel or to tell

20  the JPML panel that this Court has taken action and therefore should be appointed transferee

21  court.  In the absence of any reason why this affirmative relief should be entered—and Plaintiff

22  has still not offered one—this request should be denied.

23

24

25

26

---

27          [6] The *Balero* plaintiffs filed a copy of the same press release.  (*See* Exhibit A to
28  Declaration of William Jhaveri-Weeks, filed as Dkt. No. 59-1 in *Balero*, No. 3:15-cv-01005-JST.)

1

**B.      Plaintiff Has Adduced No Facts Warranting Court Supervision Over Defendants' Communications With Concerned Customers.**

2

3      In its initial opposition, (Opp. 12-14), Lumber Liquidators showed that there are no facts

4   warranting court supervision over its communications with concerned customers.  It showed that

5   the power to issue notices is limited to protecting "class members' right to participate in the

6   litigation [and] it does not authorize substantive orders protecting the very rights class members

7   seek to vindicate," citing *Cobell v. Kempthorne*, 455 F.3d 317, 324-25 (D.C. Cir. 2006).  In

8   Reply, Plaintiff does not mention *Cobell*.  Nor does he discuss any of the cases cited in

9   Defendants' opposition to the effect that there are two narrow exceptions to the rule that

10   otherwise allows a defendant to communicate with putative class members; that to regulate those

11   communications, the court must make specific findings that the communications interfere with

12   the putative class action, that class members are being asked to change their legal position, that

13   the communications are misleading, or that they are coercive.  (Opp. 15-24 (and cases cited).)

14   And he does not quarrel with the basis on which Defendants distinguished his cited cases.  (*Id.*)

15      Plaintiff has abandoned other arguments as well.  In his initial motion, he complained that

16   Lumber Liquidators should not have access to customers' "confidential information"—read, test

17   results.  (Memorandum of Points and Authorities in Support of Plaintiff's Emergency Motion for

18   Protective Order ("Mot.") 17:6-17, Dkt. No. 19.)  But he never mentions this again in his Reply.

19      The Court may presume he has no answer, or has abandoned those arguments.  What is

20   left?

21      First, Plaintiff complains that the indoor air testing program is aimed at putative class

22   members.  (Reply 1:2-5.)  But this is no objection.  In any event, no one should be surprised;

23   those are the people with cause to be concerned.  As for asking customers to verify on the online

24   application that they are customers who bought Chinese laminate flooring, again, this is simply to

25   make sure that they qualify for the program.[7]

26

27      [7] Even so, Lumber Liquidators has accommodated some concerned customers who didn't
28   buy Chinese laminate flooring to obtain test kits, as happened with Christopher Hyldburg, a

(Footnote continues on next page.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Second, he complains that EDLab (which is administering the program) is not certified for formaldehyde testing and he worries about the confusion that might cause. (*Id.* 6:18-10:14.) He need not worry. As Dr. Sahay made clear in his declaration, all of the labs that are doing the testing *are* certified. (Declaration of Rajiv Sahay, Ph.D in Support of Defendants' Oppositions to the Silverthorn Motion for Protective Order and Expedited Discovery and the Washington Motion for Preliminary Injunction ¶¶ 8-13, Dkt. No. 39.)

Third, he worries that Lumber Liquidators "browbeats" customers about what is "proper testing." (Reply 12:6-9.) But aside from Ms. Cottington, who complains about an unpleasant experience she had with a particular Customer Care representative, there is no other evidence that this happens to others. More importantly, the issue of testing is a red herring. As Lumber Liquidators showed in its initial opposition, in announcing its investigation, the CPSC expressly rejected "deconstructive testing"—the test on which Plaintiff stakes his safety claim—as a measure of public safety. (*Cf. Id.* 13:7-19.) Plaintiff does not mention the CPSC in his Reply.

Fourth, Plaintiff says the letters and other communications are "coercive" because customers who buy flooring have a long-term expectation of an ongoing business relationship with Lumber Liquidators. (Reply 12:19-13:6.) But as the cases cited in Lumber Liquidators' initial opposition make clear, there needs to be a "quid pro quo"—"do this or else." (Opp. 23:12-19.) Courts sometimes find such coercion in employment cases, but otherwise there is no basis to find inherent coerciveness. (*Id.* 23:20-24:2 (and cases cited).)

### C.   There Is No Evidence That Defendants' Communications Seek to Interfere With the Putative Class Action.

Plaintiff complains that Defendants' letters are "destructive to the class action process" because it is using the wrong test: "[A]ir tests—for homes inside or outside of California— simply cannot establish that these products are CARB II complaint." (Reply 13:18-21.) That misses the point. The free indoor air test is not designed to prove CARB compliance. It is a test

(Footnote continued from previous page.)

declarant in the related *Washington* case, who mistakenly thought he bought the allegedly offending product but, in fact, he did not and is not a class member.

of indoor air, designed to provide a tool for concerned customers to assess the quality of the air in their homes.  Plaintiff says this is misleading, because Defendants should be forced to admit CARB non-compliance, and that not to do so confuses air quality tests with the merits, i.e., if their air quality tests were low, then they must have received the product that was promised them. (*Id.* 13:20-25.)

This argument is a *non sequitur*.  If anything it is Plaintiff who is conflating a product test—which he insists is the only permissible test of safety—with an air test.  He further conflates CARB compliance with "safety," a notion that the CPSC has rejected.

## IV.    CONCLUSION

For the foregoing reasons, Lumber Liquidators respectfully requests that this Court deny Plaintiff's motion.

Dated:  May 8, 2015                    WILLIAM L. STERN
                                       WILLIAM F. TARANTINO
                                       JULIE Y. PARK
                                       LISA A. WONGCHENKO
                                       LAUREN WROBLEWSKI
                                       MORRISON & FOERSTER LLP

                                       By:  /s/ *William L. Stern*
                                            William L. Stern

                                       Attorneys for Defendants
                                       LUMBER LIQUIDATORS, INC.,
                                       LUMBER LIQUIDATORS LEASING,
                                       LLC, LUMBER LIQUIDATORS
                                       HOLDINGS, INC., AND LUMBER
                                       LIQUIDATORS SERVICES, LLC