1   WILLIAM L. STERN (CA SBN 96105)
    WStern@mofo.com
2   WILLIAM F. TARANTINO (CA SBN 215343)
    WTarantino@mofo.com
3   LISA A. WONGCHENKO (CA SBN 281782)
    LWongchenko@mofo.com
4   LAUREN WROBLEWSKI (CA SBN 291019)
    LWroblewski@mofo.com
5   MORRISON & FOERSTER LLP
    425 Market Street
6   San Francisco, California  94105
    Telephone:     415.268.7000
7   Facsimile:     415.268.7522

8   JULIE Y. PARK (CA SBN 259929)
    JuliePark@mofo.com
9   MORRISON & FOERSTER LLP
    12531 High Bluff Drive
10  San Diego, California  92130-2040
    Telephone:     858.720.5100
11  Facsimile:     858.720.5125

12  Attorneys for Defendants
    LUMBER LIQUIDATORS, INC.,
13  LUMBER LIQUIDATORS
    LEASING, LLC, LUMBER
14  LIQUIDATORS HOLDINGS, INC.,
    and LUMBER LIQUIDATORS
15  SERVICES, LLC

16

                    UNITED STATES DISTRICT COURT
17
                   NORTHERN DISTRICT OF CALIFORNIA
18
                       SAN FRANCISCO DIVISION
19

20  JAMES SILVERTHORN, individually and on       Case No. 15-cv-01428-JST
    behalf of all others similarly situated,                  15-cv-01475-JST
21
22                              Plaintiffs,       **SUR-REPLY DECLARATION
                                                  OF JOHN F. MCCARTHY IN
23               v.                               SUPPORT OF DEFENDANTS'
                                                  OPPOSITIONS TO THE
24  LUMBER LIQUIDATORS, INC.; LUMBER              SILVERTHORN MOTION FOR
    LIQUIDATORS LEASING, LLC; LUMBER              PROTECTIVE ORDER AND
25  LIQUIDATORS HOLDING, INC.; and LUMBER         EXPEDITED DISCOVERY
    LIQUIDATORS SERVICES, LLC.,                   AND THE WASHINGTON
26                                                MOTION FOR PRELIMINARY
                                Defendants.       INJUNCTION**
27
    [caption continued on next page]             Judge:        Hon. Jon S. Tigar
28

Sur-Reply Decl. of J. McCarthy in Oppo'n to Silverthorn and Washington Motions
Case Nos. 15-cv-01428-JST, 15-cv-01475-JST
sf-3528030

1  LILA WASHINGTON; LAURA
2  WASHINGON; RYAN and KRISTIN
   BRANDT, husband and wife; KENNETH and
3  CASANDRA BARRETT, husband and wife, on
   behalf of themselves and all others similarly
4  situated,

5              Plaintiffs,

6  v.

7  LUMBER LIQUIDATORS, INC., a Delaware
8  corporation,

9              Defendant.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Sur-Reply Decl. of J. McCarthy in Oppo'n to Silverthorn and Washington Motions
Case Nos. 15-cv-01428-JST, 15-cv-01475-JST
sf-3528030

I, John F. McCarthy, declare as follows:

1.      This declaration is filed in support of Defendants' sur-reply to the *Silverthorn* motion for protective order and expedited discovery, and the *Washington* motion for preliminary injunction, both scheduled for hearing May 14, 2015. In this Declaration, I will also respond to the declarations of David E. Jacobs, Elisabeth Black, and Chris Hyldburg, all filed on April 29, 2015 as ECF Nos. 33, 34, and 35, respectively, filed in *Washington*.

2.      Ms. Black and Mr. Jacobs have criticized opinions presented in my declaration of April 22, 2015 regarding the screening assessment for formaldehyde levels in indoor air of homes that has been undertaken by Lumber Liquidators.

### Background on Lumber Liquidators' Testing and Evaluation Program

3.      What is lacking from both Mr. Jacobs and Ms. Black's critiques is a sense of perspective as to the overall approach that Lumber Liquidators is taking in their testing and evaluation program and the fact that it is relevant to the "levels" that are being found in the subject homes. Formaldehyde is an extremely well-characterized chemical with detailed occupational, community and residential exposure studies performed by many researchers and government entities around the world that can serve to inform the dose response effects over a large range of values from essentially natural background concentrations to extremely high occupational exposures. Additionally, there have been large scale animal studies that provide further insight into the mechanistic effects. Most importantly, there is a rich history of controlled chamber studies, with humans, that provide high quality empirical data that permit determination of "no observed adverse effect levels" (NOAEL) with a high degree of confidence and the derivation of weight of evidence-based conclusions regarding anticipated exposure and effect correlations.

4.      Based on the abundance of information that is available, comments regarding "health effects" and the guidance that is being proposed to characterize the risk associated with specific exposure levels cannot be treated in the general fashion that both Ms. Black and Mr. Jacobs treat them. The vast majority of the maximum airborne levels reported are below the value considered to cause sensory irritation which has been characterized by the World Health

SUR-REPLY DECL. OF J. MCCARTHY IN OPPO'N TO SILVERTHORN AND WASHINGTON MOTIONS
CASE NOS. 15-CV-01428-JST, 15-CV-01475-JST
sf-3532364

1

Organization (WHO) as "an unpleasant sensation from the eyes and airways caused by stimulation of the trigeminal nerve endings by sensory irritants."[1] What is critical to then understand is the concentrations that have been associated with causing this effect and what forms the basis for the "no observed adverse effect level" which has been used as the foundation of guidelines for protecting the general population. In the WHO review, the "no observed adverse effect level" for sensory irritation was based on subjects demonstrating "conjunctival redness and increased eye blink frequency. . . " was found to be  0.63 mg/m$^3$ (0.5 ppm). WHO then incorporated an additional margin of safety by dividing the NOAEL by a factor of 5 and further rounding it down to 0.10 mg/m$^3$ (0.08 ppm). Furthermore, sensory irritation triggered by formaldehyde inhalation is reversible and continued exposure at those levels has been shown not to result in cumulative effects. The important point to note here is that, with formaldehyde, we are not dealing with a compound that has wide-ranging uncertainties in its exposure-response relationship and we are not dealing with a "bright line" of a concentration that represents a healthful/unhealthful condition in the guidelines that have been established by cognizant organizations.

5.      To provide additional perspective on exposure concentrations relevant to this matter, I reviewed the scientific literature and gathered information on levels of formaldehyde found in indoor air of homes. A summary of my findings is provided in Exhibit A to this declaration. An important point to note from looking at the measured concentrations that are found in typical homes of the United States is that there is significant variation (Exhibit A). Importantly, the sampling approach that is being utilized in the Lumber Liquidators program is capable of accurately assessing the anticipated range of concentrations within the relevant time frame of the sample collection period.

**An Initial Screening Step is a Common and Appropriate Response**

---

[1]      WHO. 2010. WHO Guidelines for Indoor Air Quality, Selected Pollutants. Copenhagen, Denmark: World Health Organization.

SUR-REPLY DECL. OF J. MCCARTHY IN OPPO'N TO SILVERTHORN AND WASHINGTON MOTIONS
CASE NOS. 15-CV-01428-JST, 15-CV-01475-JST
sf-3532364

2

6.       An initial screening step of the type undertaken by Lumber Liquidators is a common and appropriate response to an indoor air quality concern. Consider the initial response of the United States government public health authorities in 2009 to reports of malodors, corrosion of metal objects, and health symptoms in newly constructed/renovated homes throughout the Southeast United States in relation to drywall. Initially, the United States Consumer Product Safety Commission (CPSC) took action to characterize the scope of the concerns by creating an on-line portal (web site) that people could use to register and also complete a questionnaire on their experience and complaints. CPSC registered thousands residences within the first several months of the program. In a second stage approach, after completing its initial step of registering concerned members of the public, CPSC collaborated with United States Environmental Protection Agency (EPA) to conduct a pilot study of six homes[2] that was intended to evaluate sampling protocols and collect initial information on conditions in 'complaint' homes. Approximately four months later, CPSC commissioned an in-depth investigation of a cross section of 41 complaint homes designed to be representative of the homes with potential problems.[3] The initial steps in the Lumber Liquidators program include registration through an on-line resource, rapid screening by in-home testing, a follow-up questionnaire, and possible further testing based on initial sample results and as such are a direct analog to the steps taken by CPSC in response to public concerns about problematic drywall.[4]

**The 2004 CARB Study Is Analogous**

7.       The Lumber Liquidators  approach is consistent with those that have been used previously by various agencies and investigators. An excellent example is provided in California's Environmental Protection Agency's Air Resources Board (CARB) 2004 Report to the California Legislature, "Environmental Health Conditions in California's Portable

[2]      Layne, A. EPA's Activities on Chinese Drywall. Oral Presentation at Technical Symposium on Corrosive Imported Drywall Nov 5-6, 2009.

[3]      CPSC. EH&E's Final Report on an Indoor Environmental Quality Assessment of Residences Containing Chinese Drywall. January 28, 2010. CPSC-S-09-0027.

[4]      CPSC/EPA/HUD/CDC/ATSDR Press Statement on Initial Chinese Drywall Studies. 2009. http://www.cpsc.gov

SUR-REPLY DECL. OF J. MCCARTHY IN OPPO'N TO SILVERTHORN AND WASHINGTON MOTIONS
CASE NOS. 15-CV-01428-JST, 15-CV-01475-JST
sf-3532364

3

Classrooms."[5] This CARB assessment program was developed to address "concerns that California's schools, especially portable classrooms, might not provide healthful environments for students or teachers." I believe it is instructive to review the specific objectives that this study was designed and implemented to achieve. As stated in the final report," The purpose of the California Portable Classrooms Study was to:

- Conduct a comprehensive study and review of the environmental health conditions in portable classrooms.
- Identify any potentially unhealthful environmental conditions, and their extent.
- In consultation with stakeholders, identify and recommend actions that can be taken to remedy and prevent any unhealthful conditions identified."

I believe that what is reproduced above is could also describe the objectives that Lumber Liquidators has established for their testing program , especially when you substitute "customer homes" for "classrooms" and "residents" for "students or teachers".

8.     The CARB study was divided into two phases, where the first phase consisted of a screening level assessment where a mail survey was administered to 1000 schools randomly selected statewide. "For each school, the facility manager and three teachers (two from portable classrooms and one from a traditional classroom) were asked to complete detailed questionnaires on all aspects of the classrooms pertaining to environmental quality. Additionally, formaldehyde sampling tubes were sent to about two-thirds of the schools, for deployment in the three classrooms." Phase II was largely based on the results obtained in Phase I and had comprehensive chemical, biological, and environmental measurements collected in 201 classrooms at 67 schools randomly selected statewide. However, of the 67 schools studied in Phase II, "14 schools were specially selected into the Phase II sample based on their Phase I results (high complaints of environmental problems or high formaldehyde levels), to help

---

[5]     California Air Resources Board. 2004. Environmental Health Conditions in California's Portable Classrooms. Report to the California Legislature.

Sur-Reply Decl. of J. McCarthy in Oppo'n to Silverthorn and Washington Motions
Case Nos. 15-cv-01428-JST, 15-cv-01475-JST
sf-3532364

4

determine whether classrooms with apparent or reported problems actually had serious environmental problems."

9.      This 2004 CARB study reflects a thoughtful and well performed assessment of the portable classrooms and meets the objectives it set out to accomplish, as does the Lumber Liquidators sampling program. The CARB study is very analogous to the Lumber Liquidators program in that both are designed to assess the environmental conditions in their target buildings, they both use accepted sampling techniques, they both provide sampling instructions to previously untrained lay people to do the initial screening, they both use questionnaires to probe more deeply into specific target environments, they both utilize well-established guidelines to assess the potential for risk and they both did (or in Lumber Liquidators case, intend) to perform follow-up studies in a second phase where they are doing a more detailed investigation of buildings that noted problems, to determine possible specific causes and assess risk.

**Mr. Jacobs' Criticism of Lumber Liquidators' "Second Step" is Unfounded**

10.      Mr. Jacobs criticism of the second step in Lumber Liquidators plan for evaluating formaldehyde in homes of people who requested test kits is unfounded. As described in my previous declaration[6], Lumber Liquidators will administer a follow-up questionnaire to customers with screening levels of formaldehyde greater than 0.08 parts per million (ppm). The questionnaire will allow Lumber Liquidators to gather information necessary to plan additional evaluations of properties with potentially elevated levels of formaldehyde in indoor air. In particular, the questionnaire will elicit building-specific and product-specific information necessary to obtain refined data on formaldehyde levels and contributing sources. Ironically, this is precisely the type of information that Mr. Jacobs indicates should be gathered.[7]

**Ms. Black's Criticism of Lumber Liquidators' Approach is Unfounded**

---

[6]      Declaration of John F. McCarthy, Sc.D., C.I.H. Case Nos. 15-cv-01428-JST, 15-cv-01475-JST, April 22, 2015

[7]      Declaration of David E. Jacobs, Ph.D., CIH, No. 15-cv-01475-JST, April 29, 2015.

Sur-Reply Decl. of J. McCarthy in Oppo'n to Silverthorn and Washington Motions
Case Nos. 15-cv-01428-JST, 15-cv-01475-JST
sf-3532364                                                                                          5

11.     Ms. Black is also critical of the Lumber Liquidators approach to evaluate formaldehyde in homes, but her criticisms are not supported. On the one hand, she acknowledges that passive sampling badges of the type used in the Lumber Liquidators screening analyses are "widely used as a screening and research tool."[8]  Surprisingly however, Ms. Black then contends that Lumber Liquidators should not use passive sampling badges to screen formaldehyde levels in homes.[9]  Furthermore, she does not address the widespread usage of passive badges for the many previously-cited, peer-reviewed documents of screening studies performed in the United States and other countries. I find that her opinions are not consistent with each other.

12.     In her reply declaration, Ms. Black also asserts that the screening measurements made as part of the Lumber Liquidators program constitute an "exposure assessment".[10] Ms. Black then proceeds to state that she does not understand why I expressed the opinion that the measurements are not intended to provide a quantitative exposure assessment. My reasoning is straightforward. In the context of evaluating chemical hazards, exposure is defined as contact between a substance of interest, such as formaldehyde, and a person.[11] The current phase of the Lumber Liquidators program is not intended to assess a specific individual's exposure to formaldehyde, but instead to provide a means for consumers to measure the concentration of formaldehyde in the indoor air of their residence and determine if it is out of the ordinary or common compared to levels typically found in residences in the United States. A quantitative exposure assessment would consider human activity patterns, building conditions, and other information in addition to formaldehyde concentration. Ms. Black ignores this concept of exposure assessment as used in public health and industrial hygiene.

---

[8]     Declaration of Elisabeth Black, No. 15-cv-01475-JST, April 29, 2015

[9]     Black declaration, April 29, 2015

[10]    Black declaration, April 29, 2015

[11]    WHO. 2000. World Health Organization Environmental Health Criteria 214, Exposure Assessment, Geneva, Switzerland.

13.     Ms. Black contends that consumers with test kit results below a certain, unspecified concentration will receive no additional information from Lumber Liquidators.[12] I have made no such representation and neither has Lumber Liquidators in any of the information that I have reviewed to date.

**Lumber Liquidators' Use of 0.020 – 0.100 ppm as "Normal" Indoor Air is Reasonable**

14.     In addition, Ms. Black criticizes Lumber Liquidators for providing consumers with information on what scientists have characterized as normal levels of formaldehyde in indoor air.[13] Lumber Liquidators provides this information in letters to consumers that accompany test kit results. The letters state that formaldehyde concentrations between 0.020 to 0.100 parts per million (ppm) are normal. Lumber Liquidators obtained this range from a draft EPA report which in turn cites a peer-reviewed scientific publication.[14,15] To evaluate the foundation of Ms. Black's criticism more fully, I examined the original figure (Figure 17) and accompanying narrative in Salthammer, et al. (2010). I found that for purposes of Figure 17, Salthammer, et al. define 'normal indoor conditions' as formaldehyde levels that are less than the WHO Guideline Value of 0.08 ppm rather than measured levels of formaldehyde in non-complaint homes. It is important to note that Salthammer et al. also summarize the literature on measured levels of formaldehyde indoor air around the world (in their Table 7). That table clearly shows that formaldehyde levels between 0.020 ppm and 0.100 ppm are well within the range of concentrations observed in non-complaint homes. Therefore, Lumber Liquidators's characterization of levels between 0.0200 and 0.100 as 'normal' is fully correct. For these reasons, I concluded that Ms. Black's criticism of Lumber Liquidators' representation of normal levels unfounded.  (For purposes of this analysis, a non-complaint home is considered to be one

---

[12]    Black declaration, April 29, 2015, ¶3

[13]    Black declaration, April 29, 2015,

[14]    EPA. 2010. Toxicological Review of Formaldehyde - Inhalation Assessment (External Review Draft). EPA/635/R-10/002A. Washington, DC: US. Environmental Protection Agency.

[15]    Salthammer T, Mentese S, Marutzky R. 2010. Formaldehyde in the Indoor Environment, *Chemical Reviews,* 110, 2536-572.

SUR-REPLY DECL. OF J. MCCARTHY IN OPPO'N TO SILVERTHORN AND WASHINGTON MOTIONS
CASE NOS. 15-CV-01428-JST, 15-CV-01475-JST
sf-3532364

7

1    that was not noted to be investigated or analyzed due to occupant complaints associated with

2    formaldehyde.)

3        15.    To further evaluate the criticisms of Ms. Black, I performed my own review of the

4    scientific literature and gathered information on levels of formaldehyde found in indoor air of

5    U.S. homes not known to have an indoor air quality concern with formaldehyde, i.e., non-

6    complaint homes. A summary of my findings is provided in Exhibit A to this declaration. The

7    average and median concentration of formaldehyde reported in each study that I identified, along

8    with corresponding percentiles of the distribution of concentrations observed among homes are

9    presented in Exhibit A. The average concentrations among the various studies range from 0.017

10   ppm among homes in California to 0.070 ppm for homes in the southeast United States. The

11   three highest maximum concentrations across the studies are 0.110, 0.300, and 0.340 ppm. To

12   provide additional context to the criticisms of Ms. Black, I prepared a chart that illustrates the

13   formaldehyde levels identified by my literature search of non-complaint US homes and the

14   summary of international data (removing noted complaint residences) published in Salthammer,

15   et al. (2010) (see Exhibit B). The figure clearly shows that formaldehyde levels between 0.020

16   and 0.100 frequently occur in homes in the United States. Exhibit B also illustrates the margin of

17   safety, that I initially discuss in paragraph 4, in relation to the levels of formaldehyde that have

18   been measured in homes. Of note, formaldehyde levels reported for the U.S. are all below the no

19   observed adverse effect level identified by WHO and the State of California Office of

20   Environmental Health Hazard Evaluation in their respective reviews of the formaldehyde health

21   literature. In summary, the results of my literature review corroborate the statements made by

22   Lumber Liquidators about normal levels of formaldehyde in indoor air of homes in the United

23   States.

24

25        **Both Declarants' Criticism of the WHO Guideline Level is Unfounded**

26        16.    Both Ms. Black and Mr. Jacobs are also critical of the guideline level from the

27   World Health Organization (WHO) upon which Lumber Liquidators and I have relied to provide

28

Sur-Reply Decl. of J. McCarthy in Oppo'n to Silverthorn and Washington Motions
Case Nos. 15-cv-01428-JST, 15-cv-01475-JST
sf-3532364

8

context to the measurements made as part of the screening component of the evaluation program. However, their criticisms are without merit for the following reasons.

17.     First, the World Health Organization reviewed the scientific literature on health in relation to formaldehyde exposure and concluded that inhalation exposures to concentrations less than 0.081 ppm (0.1 mg/m$^3$) for a duration of 30 minutes  are unlikely to yield a very specific adverse effect on health, namely, sensory irritation.[16] To derive this value, WHO began with the lowest concentration (0.630 mg/m$^3$, or 0.513 ppm) that was observed not to produce a significant increase in objective measures of sensory irritation, specifically eye blink rate, among participants in a double-blinded, controlled exposure study. Next, WHO divided that concentration by 5 to account for variability of sensory irritation among individuals resulting in a concentration of 0.126 mg/m$^3$ (0.102 ppm). Finally, WHO rounded the result down to one significant figure to arrive at a guideline value of 0.1 mg/m$^3$ which is equivalent to 80 ppb.

18.     Second, Mr. Jacobs (paragraph 9)[17] misstates the intent of my comment regarding the fact clearly stated in the WHO publication that I cited in my April 22, 2015 declaration that, "a value of 0.125 mg/m$^3$ (0.10 ppm) was considered safe for the entire population against sensory irritation, including chronic sensory irritation," by implying I was advocating that was to be used as a guideline. I had included that reference as well as one from Golden[18] to refute Ms. Black's statement that a wide variety of adverse health outcomes would be experienced at the 0.10 ppm concentration level. Mr. Jacobs then continues on to cite information extracted from the Executive Summary of the WHO Guidelines that support the use of a quantitative value that will protect public health from "pollutants that are known or are likely to be hazardous." The WHO Guideline is derived from an expert panel's review  of studies that determined that the No

---

[16]     WHO. 2010. WHO Guidelines for Indoor Air Quality, Selected Pollutants. Copenhagen, Denmark: World Health Organization.

[17]     Jacobs declaration, April 29, 2015

[18]     Golden R. 2011. Identifying an indoor air exposure limit for formaldehyde considering both irritation and cancer hazards. *Critical Reviews in Toxicology,* Vol. 41, No. 8, Pages 672-721.

Sur-Reply Decl. of J. McCarthy in Oppo'n to Silverthorn and Washington Motions
Case Nos. 15-cv-01428-JST, 15-cv-01475-JST
sf-3532364

9

Observable Adverse Effect Level (NOAEL) was 0.63 mg/m$^3$ (0.513 ppm) and an application of an additional safety factor to arrive at a guideline value of 0.1 mg/m$^3$ (0.80 ppm) that they further go on to qualify that "The short-term guideline will also prevent effects on lung function as well as long-term health effects, including nasopharyngeal cancer and myeloid leukemia." This guideline seems to meet the definition of "a minimum exposure" that Mr. Jacobs bolded in his comment, since the WHO does not feel that there are any adverse effects to be found if this guideline is adhered to.

19.    Mr. Jacobs (his paragraph 10)[19] clearly misstates my commentary in my declaration. First, I did not state or reference the indoor air quality guideline for formaldehyde in my paragraph 10[20], which again was a response to erroneous statements made by Ms. Black in her declaration. Specifically, I quoted a statement that was included in the WHO formaldehyde review document to help inform the discussion with Ms. Black. Second, Mr. Jacobs incorrectly cites the WHO indoor air quality guideline as being 0.10 ppm. Reading the WHO document it is obvious that the WHO guideline is actually 0.10 mg/m$^3$ which would convert to 0.08 ppm. Third, I did not make "selected references to exposure limits for formaldehyde". I corrected a misstatement that Ms. Black had made in quoting an exposure level for adverse health effects and presented an additional clarifying remark as noted in my point number one above. Nowhere did I promote any "selected references to exposure limits" and suggest that they should be used as guidelines of acceptability in evaluating the data collected from the Lumber Liquidators sampling program.

20.    Mr. Jacobs and Ms. Black contend that children, people with asthma, and elderly persons are especially sensitive to formaldehyde, however, the scientific literature does not support that contention. For example, WHO evaluated this possibility and concluded that the literature does not demonstrate differences in sensitivity to formaldehyde among subgroups of the population, including children. This view is shared by the California Office of Environmental

---

[19]    Jacobs declaration, April 29, 2015.

[20]    McCarthy declaration, April 22, 2015.

SUR-REPLY DECL. OF J. MCCARTHY IN OPPO'N TO SILVERTHORN AND WASHINGTON MOTIONS
CASE NOS. 15-CV-01428-JST, 15-CV-01475-JST
sf-3532364

10

Health Hazard Assessment (OEHHA)[21] program which sets health protective guidelines for substances in air. OEHHA correctly describes sensory irritation as a result of stimulating the trigeminal nervous system. Further, OEHHA notes that trigeminal nerve effects are a direct result of concentration and should not be related to differential breathing rates between children and adults. OEHHA also states that there is no evidence that children have different or more irritation receptors than adults. For those reasons, "OEHHA does not assume that children are more sensitive than adults to sensory effects of eye, nasal, or respiratory irritants." With respect to exacerbation of asthma, Golden[22] cites the conclusion reached by the National Academy of Sciences (NAS) in 2007[23] "Individual susceptibility to formaldehyde appears to be difficult to predict, and typically sensitive groups such as asthmatic individuals, do not appear to be any more sensitive to irritation effects than healthy subjects at exposure concentrations below 3 ppm." Given the conclusions found in the reviews by WHO,  OEHHA and NAS, and in conjunction with my own training and experience, I believe that special consideration of subpopulations by the Lumber Liquidators indoor air quality program is not warranted at this time.

21.     Mr. Jacobs, in paragraph 5[24], introduces a misleading argument in an attempt to establish that children represent a susceptible population that should be evaluated separately by attempting to make a comparison with childhood lead exposures to formaldehyde in air. He totally ignores the multiple differences between the two chemicals that have been well documented and extensively characterized in the scientific literature including: primary routes of exposure – children ingest lead containing dust, paint chips contaminated food and water in addition to inhalation where formaldehyde is via inhalation alone; have differential rates of

---

[21]     California Office of Environmental Health Hazard Assessment (OEHHA) http://oehha.ca.gov/

[22]     Golden R. 2011. Previously cited.

[23]     National Academy of Sciences. 2000. Clearing the Air: Asthma and Indoor Air Exposures. Washington, DC: Institute of Medicine.

[24]     Jacobs declaration, April 29, 2015

SUR-REPLY DECL. OF J. MCCARTHY IN OPPO'N TO SILVERTHORN AND WASHINGTON MOTIONS
CASE NOS. 15-CV-01428-JST, 15-CV-01475-JST
sf-3532364

11

uptake – children absorb 4-5 times more lead from a given source than adults where no

differential absorption has been found for formaldehyde; site of action – after lead enters the

body, it is distributed to organs such as the brain, kidneys, liver and bones whereas multiple

studies have been reported to show that airborne formaldehyde does not move past the nasal

epithelium to impact other sites in the body;[25] toxicological impact – at high levels of exposure,

lead will impact the brain, and central nervous system and at lower levels of exposure lead can

chronically effect children's brain development, cause anemia, hypertension, and renal

impairment among others. The neurological and behavioral effects of lead are believed to be

irreversible. For formaldehyde, at the levels typically found in homes there is no chronic impact.

Even at the extreme levels reported in homes, formaldehyde would cause readily reversible

sensory irritation effects of the eye, nose and throat; deposition in the body – lead has a well

documented long term storage in the bones and teeth that can lead to remobilization depending

on nutritional deficits. Formaldehyde has no long term storage capabilities and the sensory

impacts are readily reversible after eliminating excessive exposure. For these reasons, among

others, the comparison as presented is irrelevant in providing a rationale for including children as

a unusually susceptible population in assessing exposures to formaldehyde.

22.     Third, Mr. Jacobs and Ms. Black suggest using a pair of guideline values that are

not applicable to residential indoor air quality. In particular, they criticize Lumber Liquidators

and me for not noting a guideline value for formaldehyde recommended by the U.S. National

Institute of Occupational Safety and Health (NIOSH). Their criticism is unfounded. The NIOSH

guideline value is applicable to workplace environments, which is obviously distinct from a

residential setting.

23.     Similarly, Mr. Jacobs and Ms. Black criticize me for not referring to a guideline

value recommended by the U.S. Agency for Toxic Substances and Disease Registry (ATSDR)

which is termed a Minimum Risk Level or MRL. Again the criticism is unfounded, for ATSDR

---

[25]     US Department of Health and Human Services. 2007.Toxicological Profile for Lead.
Washington, DC: Agency for Toxic Substances and Disease Registry

SUR-REPLY DECL. OF J. MCCARTHY IN OPPO'N TO SILVERTHORN AND WASHINGTON MOTIONS
CASE NOS. 15-CV-01428-JST, 15-CV-01475-JST
sf-3532364

12

explicitly states that MRLs are applicable to areas impacted by hazardous waste sites, an exposure scenario that is quite different from a residence. Furthermore, in describing the usage of MRLs the ATSDR specifically states: "These substance specific estimates, which are intended to serve as screening levels, are used by ATSDR health assessors and other responders to identify contaminants and potential health effects that may be of concern at hazardous waste sites. **It is important to note that MRLs are not intended to define clean up or action levels for ATSDR or other Agencies.**" [emphasis from original citation][26]

24.     Fourth, Mr. Jacobs and Ms. Black suggest that the Lumber Liquidators indoor air quality program should produce results that can be compared to guideline levels established for short, intermediate, and long durations of exposure, such as those recommended by CA OEHHA, yet they do not seem to understand that the Lumber Liquidators program is intended to achieve that aim. Comparisons to guideline values begin with the availability of valid data on exposure concentrations. To that point, I previously stated that, "Lumber Liquidators utilized a well-documented and scientifically valid testing procedure employing passive dosimeters to provide a screening level review for formaldehyde levels in homes that had installed the subject flooring."  In the next step of the program, Lumber Liquidators will begin to collect information needed to assess exposure for occupants of residences potentially impacted by the subject flooring.

**The Criticism That This Is a Resident-Deployed Sampling Technique is Unfounded**

25.     Mr. Jacobs and Ms. Black contend that all in-home activities related to assessing formaldehyde levels should be conducted by trained professionals. They are incorrect. As described in my prior declaration, numerous peer-reviewed scientific papers describe exposure assessments that rely upon resident-deployed, passive air sampling kits accompanied by instructions from trained professionals. Notably, Mr. Jacobs and Ms. Black do not acknowledge the numerous examples of this approach that I provided previously.

---

[26]     ATSDR. Toxic Substances Portal. Minimum Risk Levels (MRLs).
http://www.atsdr.cdc.gov/mrls/index.asp

Sur-Reply Decl. of J. McCarthy in Oppo'n to Silverthorn and Washington Motions
Case Nos. 15-cv-01428-JST, 15-cv-01475-JST
sf-3532364

13

26.     Jacobs contends that the instructions included with the test kits provided by Lumber Liquidators "are likely to underestimate true formaldehyde levels".[27] He specifically references the instructions that allow people to operate air conditioners and fans during the testing. He is incorrect for several reasons.

- First, the instructions advise consumers to continue their normal practices for heating, cooling, and ventilation. This instruction is intended to ensure that the sampling program provides meaningful information about the actual formaldehyde levels present during typical occupancy conditions. Advising consumers to alter their standard practices during the sampling could create artificial or unrepresentative conditions.

- Second, the test kits distributed by Lumber Liquidators will likely overestimate, rather than underestimate, formaldehyde levels that could be attributed to products purchased from Lumber Liquidators. Overestimation is likely because there are many possible sources of formaldehyde emissions within the home environment, including cooking, smoking, furniture, cabinetry, drapery, and the outdoors.

- Third, because the samples are to be collected over 24 hours the results are likely to represent a more extreme condition than samples collected over a longer period of time.

27.     In Mr. Jacobs' paragraph 24[28], he contends that "remediation measures **must be taken immediately** when elevated levels of formaldehyde are present in a home environment" (emphasis added). In paragraph 11[29] of his opinion, Jacobs suggests that "elevated levels of formaldehyde" are defined by concentrations greater than the CA OEHHA value for chronic exposure, which is currently 7 parts per billion (ppb). And as justification for this opinion, Jacobs states that any delay [in remediation] exposes residents to risk of cancer and other adverse health effects. He then characterizes Lumber Liquidators response to concerns about formaldehyde as "irresponsible in the extreme and quite likely dangerous."  For the reasons

---

[27] Jacobs declaration, April 29, 2015, ¶

[28]     Jacobs declaration, April 29, 2015,

[29]     Jacobs declaration, April 29, 2015,

SUR-REPLY DECL. OF J. MCCARTHY IN OPPO'N TO SILVERTHORN AND WASHINGTON MOTIONS
CASE NOS. 15-CV-01428-JST, 15-CV-01475-JST
sf-3532364

14

described below, Mr. Jacobs' opinions on remediation are outside the standard practice for managing formaldehyde levels in indoor air:

- First, levels of formaldehyde in nearly all residential buildings of the U.S. are greater than the OEHHA guideline value for chronic exposure of 7 ppb (*see* Exhibits B & C), I am not aware of a government or other public health agency that has immediately initiated remediation efforts for the building stock within its jurisdiction based on that finding. Two examples from California are summarized here; numerous other examples are available as well.

- In 2009, the California Air Resources Board (CARB) reported that 100% of 105 homes studied had formaldehyde levels in indoor air greater than the OEHHA guideline value for chronic exposure and 6% exceed the acute exposure guideline value, yet the State of California has not initiated or recommended a remediation program for those homes.

- In 2004, CARB reported that formaldehyde levels in 37% of 911 classrooms exceeded the State's indoor reference exposure levels, yet the State did not immediately initiate a remediation program for those schools.

- Second and as described more fully in paragraph 4 of this declaration, sensory irritation triggered by formaldehyde inhalation is reversible and continued exposure at those levels has been shown not to result in cumulative effects.

- Third, Lumber Liquidators response, including screening measurements and follow-up assessment, to concerns about formaldehyde associated with its products has been rapid in comparison to similar evaluations that have been done, including investigations conducted by the State of California.[30]

**The Criticism of Using NIOSH Method 2016 for Sample Analysis is Unfounded**

---

[30]    Jacobs declaration, April 29, 2015.

Sur-Reply Decl. of J. McCarthy in Oppo'n to Silverthorn and Washington Motions
Case Nos. 15-cv-01428-JST, 15-cv-01475-JST
sf-3532364

15

28.     In paragraph 14 of Mr. Jacobs' declaration[31] he takes issue with the use of NIOSH Method 2016 for analysis of the passive dosimeters employed in the Lumber Liquidators program. A careful reading of my original statement will show that it clearly states that the method being employed "has been modified for use with passive samplers" as has been reported by the laboratories performing the analyses. I did not cite the "ISO 16000-4:2011 Determination of formaldehyde—Diffusive sampling method"[32] because that is not the method the laboratories are using, and that reference would be inaccurate. Although the sampling method as described in NIOSH 2016 is an active sampling method, many commercial laboratories have adopted the analytical method for extracting and analyzing the samples obtained from the passive dosimeters. Furthermore, this approach of collecting low concentrations of formaldehyde onto passive samplers and analyzing the subsequent extract using NIOSH Method 2016 has been evaluated and validated by the Naval Research Laboratory in 2012[33]. Mr. Jacobs takes issue with my reference to the limit of detection (LOD). He states "the LOD to be 0.003 $mg/m^3$ not ppm according to ISO."   Again, bearing in mind that it would be improper for me to cite the ISO methodology since that was not the analytical procedure being employed by the laboratories analyzing the samples, Mr. Jacobs should be aware that it is reasonable and appropriate to convert units of $mg/m^3$ to ppm to maintain consistency in the terminology of the presentation of the facts.

29.     Furthermore, I did not convert the value of the LOD provided in the ISO method, but rather selected the highest value from the laboratories that are performing the analyses and who are responsible for determining and reporting their LODs. However, there is a methodological flaw in Mr. Jacobs' argument since, if we utilize the commonly accepted

---

[31]     California Air Resources Board. 2004. Environmental Health Conditions in California's Portable Classrooms. Report to the California Legislature.

[32]     ISO. 2011. ISO 16000-4:2011 Indoor air Part 4: Determination of formaldehyde - Diffusive sampling method. International Organization for Standardization.

[33]     Johnson KJ, Hughes JM. 2012. Formaldehyde Five-Day Passive Chemical Dosimeter Badge Validation Study. *Naval Research Laboratory,* NRL/MR/6180--12-9454.

SUR-REPLY DECL. OF J. MCCARTHY IN OPPO'N TO SILVERTHORN AND WASHINGTON MOTIONS
CASE NOS. 15-CV-01428-JST, 15-CV-01475-JST
sf-3532364

16

formulas presented in the American Conference of Governmental Industrial Hygienists (ACGIH) publication "TLVs™ and BEIs™ Based on the Documentation of the Threshold Limit Values for Chemical Substances and Physical Agents and Biological Exposure Indices"[34], the ACGIH specifies using normal temperature and pressure (NTP) conditions of 25 degrees Celsius (C) and 760 torr in the calculations not the temperature of 20 C that Mr. Jacobs used.

30.     It is surprising that Mr. Jacobs utilized "normal atmospheric pressure of 760 mm Hg (torr) and yet did not use the temperature of 25 C that is considered normal and utilized in the ACGIH publication. Finally, Mr. Jacobs is being disingenuous to imply, even if there was an 8% difference in the LOD that is being reported, that it is "important from a health protection and exposure assessment standpoint."  The LOD we are discussing here has to do with concentrations that range from 0.002 to 0.003 ppm (0.00246 to 0.00368 mg/m$^3$ respectively, using NTP conditions) which is extremely low and is approaching the background concentrations that is consistent with a "rural outside setting."  These concentrations would have no impact on providing health protection or meaningful exposure assessment.

### The Citation to the "Salthammer" Values

31.     Ms. Black and Mr. Jacobs cite Salthammer, et al. (2010)[35] for California Office of Environmental Health and Hazard Assessment (OEHHA) values for acute, 8-hour, and chronic reference exposure levels (RELs). The OEHHA values referenced in Salthammer, et al. (2010) are outdated, proposed by OEHHA in 1999 through 2005. OEHHA updated its RELs in June 2014, and the current values for acute, 8-hour, and chronic values are 44 ppb, 7 ppb, and 7 ppb, respectively.

### Additional Flaws in Mr. Jacobs Commentary

---

[34]     ACGIH. 2015. *Threshold Limit Values for Chemical Substances and Physical Agents & Biological Exposure Indices.* Cincinnati, OH: American Conference of Governmental Industrial Hygienists.

[35]     Salthammer T, Mentese S, Marutzky R. 2010. Formaldehyde in the Indoor Environment, *Chemical Reviews,* 110, 2536-572.

Sur-Reply Decl. of J. McCarthy in Oppo'n to Silverthorn and Washington Motions
Case Nos. 15-cv-01428-JST, 15-cv-01475-JST
sf-3532364

17

32.     Mr. Jacobs (in his paragraph 12)[36] has purposely truncated the quote he has taken from my April 22, 2015 declaration to provide a misleading basis for his comment. My actual statement was, "The likelihood that the sampling program would present risk to consumers from false negatives is extremely low. If anything, due to the presence of other sources of formaldehyde gas in and around residences, it is more likely to produce false positives **which would have the effect of requiring further investigation into the homes that are found to be above the level designated for further investigation**." [Emphasis added to indicate the material truncated by Mr. Jacobs.] It is important to note that, as Mr. Jacobs states, if there are other sources of formaldehyde present in a home the concentration of formaldehyde in the air will of course increase. Lumber Liquidators has recognized that fact and are willing to include houses that may have formaldehyde from other sources, but exceed the screening levels that have been established for the program, into a category that will be followed up and evaluated further. That is the definition of a "false positive" with respect to attribution to the flooring being the source of the formaldehyde in the home.

33.     Mr. Jacobs does not demonstrate an understanding of the stated goals of the Lumber Liquidators sampling program which is to use this sample collection program to serve as a screening tool to determine the homes that would require further follow-up evaluations based on current airborne concentrations. Further, he demonstrates a lack of understanding regarding the principles of the classic exposure assessment process when he states in his paragraph 12[37] that an important step in the "exposure assessment process...is assessment of source strength". That is inaccurate and misleading and does not follow the precepts laid out in the AIHA guidance for exposure assessment.[38] A multistep process is outlined that starts with a basic characterization of the areas and potential agents of concern by collecting general information, followed by defining similar exposure groups either by observation or sampling. Then there is the definition of the exposure profile with prioritization of follow-up. After that, you conclude

---

[36]     Jacobs declaration, April 29, 2015.

[37]     Jacobs declaration, April 29, 2015.

[38]     AIHA. 2006.A Strategy for Assessing and Managing Occupational Exposures, Third Edition. Fairfax, VA: American Industrial Hygiene Association.

SUR-REPLY DECL. OF J. MCCARTHY IN OPPO'N TO SILVERTHORN AND WASHINGTON MOTIONS
CASE NOS. 15-cv-01428-JST, 15-cv-01475-JST
sf-3532364

18

with exposure estimates based on qualitative, quantitative or semi-quantitative assessments. Nowhere is there a required or even preferred "assessment of source strength" recommended. To try and include an assessment of source strength in an attempt to characterize exposure at such an early part of the investigation would lead to significant inaccuracies in estimating risk to occupants because of the imprecision in modeling that would result due to numerous unknowns. Based on the information I have reviewed to date the Lumber Liquidators program is consistent with the approach outlined by the AIHA.

34.     In his paragraph 19[39] Mr. Jacobs again makes a misleading statement when referring to my paragraph 18[40]. My paragraph 18 was in direct response to Ms. Black citing the guidance that the CPSC and CARB had clearly directed to homeowners to aid them in taking interim measures to provide relief if they felt the levels were excessive in their residence. I do not believe that the CPSC or CARB ever intended increased ventilation to be the only mitigation measure employed. Furthermore, Mr. Jacobs wrongly implies that the CPSC document[41] states that there are important advantages of using professional investigators in providing mitigation recommendations. The document clearly states that in trying to reduce formaldehyde levels in the home, "Additional specific advice can be obtained from your state or local health department, physician, or professional experts in indoor air quality."

35.     Mr. Jacobs goes on to further misstate the intent of the CPSC document by implying that the CPSC preference is for IAQ professionals to collect samples in the residences. Nowhere in this document do they state a preference or make a recommendation for a professional to collect the formaldehyde samples in homes. In fact they provide the following caution, "As with IAQ professionals, sampling kits can vary in their ability to detect formaldehyde." This is hardly a ringing endorsement that only professionals should collect

---

[39]     Jacobs declaration, April 29, 2015.

[40]     McCarthy declaration, April 22, 2015.

[41]     CPSC. 2013. An Update on Formaldehyde. Publication 725. Washington, DC: US Consumer Product Safety Commission.

SUR-REPLY DECL. OF J. MCCARTHY IN OPPO'N TO SILVERTHORN AND WASHINGTON MOTIONS
CASE NOS. 15-CV-01428-JST, 15-CV-01475-JST
sf-3532364

19

samples and recognizes that not all professionals are equally competent. As was clearly presented in my earlier declaration, there are numerous government reports and peer reviewed articles that utilize untrained lay people to perform data collection as part of screening and research programs, as was the intent of this Lumber Liquidators program. If homes enter into a more detailed evaluation phase of the program, I have been informed that experienced professionals would be utilized, as appropriate, for provision of sampling and remedial recommendations.

### Review of the Sampling Results from Christopher Hyldburg

36.    Mr. Hyldburg reportedly tested the formaldehyde level in his house on two separate days. On  March 8, 2015 he sampled his kitchen and on March 31, 2015 he sampled his kitchen again as well as a pantry and the living room. On March 8, 2015, the Home Air Check test kit was reported to be used, which utilized an active sampling protocol (i.e., pulling air through a sorbent tube by a motorized pump). Mr. Hyldburg sampled the air in his kitchen over a 20-30 minute period (if it was done consistently with the directions he received with the sampling kit). On March 31, 2015, he used the test kit supplied by ED Labs, which consisted of passive badges (i.e., relying upon diffusion of air to a sorbent with no active pumping), to sample the air in the kitchen over an approximately 25-hour period. The formaldehyde levels measured in the kitchen on March 8 and March 31, 2015 was 0.042 ppm and 0.022 ppm respectively.  Mr. Hyldberg suggests that a discrepancy exists between the two test results.

37.    It is not unexpected that there is a difference between the two sample results Mr. Hyldburg obtained from his kitchen since significant differences exist between the two air sampling procedures that were utilized. These differences, which are described in more detail below, negate a direct quantitative comparison of the laboratory test results. The major differences are:

- Sampling period – The Home Air Check kit uses a very short sampling period (approximately 20 minutes) where the EDLabs integrates over a much longer period (approximately 24 hours). Therefore, individual short term events that may produce "short bursts" of higher levels of formaldehyde such as when cooking with natural gas

SUR-REPLY DECL. OF J. MCCARTHY IN OPPO'N TO SILVERTHORN AND WASHINGTON MOTIONS
CASE NOS. 15-CV-01428-JST, 15-CV-01475-JST
sf-3532364

20

appliances, smoking or when certain personal care products are used may have more of an influence on test results if they occur during the sampling period. Lower levels could occur if people are entering or exiting the home and/or operating appliances such as clothes dryers and exhaust fans during the short duration sampling program. Therefore, sampling for short periods such as the 20 minutes that was done here may result in either elevated or low levels that are not reflective of conditions over a typical day-night cycle. The passive sampling method used with the ED Labs dosimeter samples over a 24-hour period and will reflect indoor conditions that are averaged over a typical day-night cycle. The passive sampler will capture contributions associated with the "short burst" events described above as well as any contributions associated with the typical background environment related emissions (i.e., flooring, cabinetry, furniture, etc.) that will continue to emit even during the more quiescent environment that may exist over night. The results obtained from the passive dosimeter sampling will be more reflective of the typical exposure profile for home occupants.

- Sampling dates – The samples were collected on March 8 and March 31, 2015. Even when using the same methods, comparing test results from sampling events on different days introduces significant confounding factors related to occupant activity patterns, weather conditions, home air exchange and ventilation rates. These test dates occurred on different days of the week (a Sunday versus a Tuesday), had different outdoor average temperatures (28 F versus  41 F) and average wind speeds (5 mph versus 9.4 mph). Without controlling for the very different activities and occupancy patterns that can occur on weekends versus a weekday, or the atmospheric conditions which can influence air exchange rates within a home, the difference in results is expected.

- Analytical method – In addition to the widely divergent sampling methodology that was used to collect the two samples from the kitchen two totally different analytical methods were employed by Prism Analytical Technologies (for the active sampler) and EdLabs (for the passive dosimeter). There will always be some difference that can occur between

Sur-Reply Decl. of J. McCarthy in Oppo'n to Silverthorn and Washington Motions
Case Nos. 15-cv-01428-JST, 15-cv-01475-JST
sf-3532364

21

various analytical methods and without a direct "head to head" validation study one cannot determine the magnitude or direction of any potential systematic biases.

38.     For the reasons provided above, I do not feel that the different quantitative results obtained by the two different methods on two different days are surprising in the least. I think that it is notable that from a qualitative standpoint the concentrations measured in both samples indicate that the home falls within the range typical of noncomplaint residences reported in the United States as detailed in Exhibit B.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 8, 2015, in Needham, Massachusetts.

By:   _____
      John F. McCarthy

SUR-REPLY DECL. OF J. MCCARTHY IN OPPO'N TO SILVERTHORN AND WASHINGTON MOTIONS
CASE NOS. 15-CV-01428-JST, 15-CV-01475-JST
sf-3532364

22